Federico Fernández Toste, demandante y apelado, *v.* Leslie
A. MacLeod, Contador de Puerto Rico; R. Sancho Bonet,
Tesorero de Puerto Rico y Presidente de la Junta de
Pensiones del Gobierno Insular; Herman Agostini, Se-
cretario, y E. Garrido Morales, José G. López y Juan B.
Huyke, vocales, respectivamente, de la mencionada Junta,
recurridos y apelantes.

Núm. 7489.—*Sometido:* Enero 18, 1938. *Resuelto:* Marzo 29, 1938.

*Hon. Procurador General B. Fernández García, Jesús A. González,
Asesor Legal, Enrique Córdova Díaz, Subprocurador,* abogados del
Contador y Tesorero Insular; *Miguel A. Muñoz,* abogado de la
Junta de Retiro; y *R. Soltero Peralta,* abogado del apelado.

El Juez Asociado Señor Travieso emitió la opinión del tri-
bunal.

Federico Fernández Toste, el peticionario, después de
haber servido al Gobierno Insular durante más de treinta años
consecutivos, se retiró del servicio el 14 de septiembre de
1931. Durante los últimos siete años de servicio, percibió
un sueldo promedio de $3,129 anuales.

En la fecha de su retiro, el peticionario tenía derecho a
disfrutar de una pensión vitalicia de acuerdo con la Ley núm.
22 de 22 de septiembre de 1923 (Leyes de Puerto Rico, Sesión
Especial de 1923, pág. 157) por no haber renunciado a tal
beneficio antes del primero de enero de 1924, según lo dis-
puesto en la sección primera de dicha ley.

En septiembre 2 de 1925, la Asamblea Legislativa aprobó
la Ley núm. 104 (pág. 949), que provee para el retiro de

empleados permanentes del Gobierno Insular y hace extensivos sus beneficios a todos los empleados en el Servicio Civil clasificado y no clasificado. De acuerdo con las secciones 3 y 5 de dicha ley el peticionario tenía derecho al retirarse a una pensión vitalicia de $1,500 anuales.

La Ley núm. 73 de mayo 6, 1930 (Leyes de ese año, pág. 453) elevó el máximum de la pensión vitalicia a la suma de $2,000 anuales para todo empleado o funcionario que haya prestado servicios por treinta años o más.

Al retirarse de su empleo el peticionario, la Junta demandada le asignó una pensión vitalicia de $2,000 anuales, pagadera en plazos de $166.66 mensuales, pagos que recibió desde septiembre 14, 1931, hasta julio 15, 1935. Desde esa última fecha hasta el presente, el peticionario ha venido recibiendo, con su protesta, solamente $140 mensuales.

El peticionario requirió a la junta demandada para que le hiciera efectiva la diferencia de $26.66 mensuales que había dejado de pagarle. Y habiéndose negado a ello la demandada, el peticionario radicó su demanda en solicitud de un auto de *mandamus* por el que se ordene a la junta demandada que proceda a autorizar el pago de las pensiones del peticionario de acuerdo con la cantidad que le fué asignada en la fecha de su retiro.

La contestación de la junta demandada admite los hechos que acabamos de exponer, y como defensas alega:

1. Que la reducción de la pensión del peticionario se realizó a tenor de las disposiciones de la sección 11 de la Ley núm. 23, aprobada en julio 16 de 1935 (pág. 127).

2. Que el Gobierno Insular no tiene fondos disponibles que puedan ser aplicados al pago de las sumas que reclama el peticionario.

3. Que la junta demandada no tiene deber ministerial alguno que cumplir bajo la Ley núm. 104 de 2 de septiembre de 1925 (pág. 949), por cuanto dicha ley fué expresamente derogada por la Ley núm. 23 de 16 de julio de 1935; y que por lo tanto no procede el *mandamus*.

4. Que la demanda no alega hechos suficientes para constituir **una causa de acción** a favor del peticionario.

La Corte de Distrito de San Juan resolvió el caso por sentencia a favor del peticionario y la junta demandada interpuso el presente recurso de apelación. Su único señalamiento de error lee así:

"La Corte de Distrito del Distrito Judicial de San Juan cometió error al resolver 'que la Legislatura de Puerto Rico carecía de autoridad legal para rebajar una pensión concedida por una ley anterior, y al resolver que era anticonstitucional la sección 11 de la Ley núm. 23 de 16 de julio de 1935.''

██ El precepto legal de cuya constitucionalidad se trata es la sección 11 de la Ley núm. 23 de 16 de julio de 1935, Leyes de ese año, Sesión Extraordinaria, pág. 127, que lee así:

"Sección 11.—Cada uno de los funcionarios y empleados del Gobierno Insular de Puerto Rico que, antes de entrar en vigor esta Ley, hubiere sido retirado o cuya solicitud de pensión hubiere sido resuelta favorablemente de acuerdo con las disposiciones de las Leyes núm. 22 de 22 de septiembre de 1923, y núm. 104 de 2 de septiembre de 1925, tal como fué enmendada por la Ley núm. 33 de 21 de abril de 1928, por la Ley núm. 73 de 6 de mayo de 1930, y por la Ley núm. 37 de 4 de mayo de 1933, tendrá derecho a recibir la renta vitalicia que le fué originalmente asignada menos un descuento que se computará en la forma siguiente:

A los pensionados que tengan actualmente 50 años o menos de edad se descontará el 20 por ciento. A los que tengan más de 50 años se les reducirá este descuento a razón de 1 por ciento por cada año de edad que tengan sobre 50, de modo que a los de 70 años de edad este descuento quedará reducido a cero. *Disponiéndose,* que estos descuentos no serán aplicables a rentas vitalicias menores de treinta dólares ni a aquellos pensionados que se encuentren físicamente incapacitados para trabajar y que no tengan otro ingreso de clase alguna.''

Alega el peticionario apelado que el estatuto es contrario a la Constitución porque le priva del derecho adquirido (*vested right*) por él al amparo de la legislación anterior, sin el debido procedimiento de ley. Y para sostener la validez constitucional del estatuto, la junta apelante invoca las decisiones de esta

Corte Suprema en los casos de *Luján* v. *Comisión de la Policía Insular,* 38 D.P.R. 58, y *Domenech* v. *Junta de Pensiones,* 42 D.P.R. 604.

La regla que consideramos aplicable a los hechos de este caso aparece así expuesta en la monografía publicada en 98 A.L.R. pág. 507:

"*Concesión oficial de pensión: cumplimiento de las condiciones.*

"Se dice en la anotación anterior que cuando un pago determinado bajo una pensión ha vencido, está generalmente admitido que el pensionista tiene un derecho adquirido sobre dicho pago. De un examen de los casos más recientes aparece que esto es cierto no sólo en cuanto a plazos específicos que hayan vencido y que sean inmediatamente pagaderos, sino también en cuanto a plazos que no son inmediatamente exigibles pero que puedan serlo en alguna fecha futura, *siempre que todas las condiciones que dan derecho al empleado a una pensión se hayan cumplido, especialmente cuando se ha tomado acción oficial concediendo la pensión. Puede decirse que la regla es que cuando se ha resuelto que un empleado tiene derecho a una pensión y ésta le ha sido concedida oficialmente, o cuando ha ocurrido el suceso del que dependía la concesión de la pensión, ésta entonces se convierte en un derecho adquirido y no puede ser revocada o afectada más tarde.* Esta regla está sostenida por las siguientes autoridades, además de las ya citadas en la anotación anterior: (siguen numerosas citas)". (Bastardillas nuestras.)

En el caso de *Kavanagh* v. *Board of Police Pension Fund Commissioners,* 134 Cal. 50, se resolvió que cuando la viuda de un empleado retirado y pensionado adquirió el derecho a recibir cierta cantidad del fondo de pensiones a la muerte de su marido, mientras el estatuto estaba en vigor, su derecho a recibir dicha cantidad se convirtió en un derecho adquirido, y que no era de la competencia de la Legislatura privarla de ese derecho adquirido mediante la derogación del estatuto.

Convenimos con la corte inferior en que la decisión de esta Corte Suprema en *Luján* v. *Comisión de la Policía Insular* no se ajustó estrictamente a la doctrina sentada por el Tribunal Supremo de Estados Unidos en el caso de *Pennie* v. *Reis,* 132 U. S. 464, 471. Un estudio más crítico y detenido

de ambas decisiones revela que no existe analogía entre las cuestiones envueltas en uno y en otro caso.

Veamos los hechos en el caso de *Pennie* v. *Reis,* supra. Una ley de California del año 1878 autorizaba al Tesorero de de San Francisco para que retuviera dos dólares mensuales de la paga de cada policía para constituir un fondo de seguros de vida, del que se pagarían $1,000 a los herederos de cualquier policía que falleciere. El policía Ward contribuyó a dicho fondo desde abril 1, 1878, hasta marzo, 1889. Con anterioridad a su fallecimiento la Asamblea Legislativa de California derogó la ley de 1878 y aprobó la de 4 de marzo de 1889, en virtud de la cual se disponía de los fondos en forma distinta a la provista en la ley derogada. Al ocurrir el fallecimiento de Ward, el administrador de sus bienes reclamó la suma de $1,000 de acuerdo con el estatuto derogado. La Corte Suprema de California resolvió el caso por sentencia adversa al administrador. La sentencia confirmatoria del Tribunal Supremo Federal se basa en la misma doctrina arriba transcrita de 98 A.L.R. 507, como se verá por la lectura de lo que sigue:

"Siendo un fondo levantado en esa forma, estaba enteramente a disposición del gobierno, hasta que, por la ocurrencia de uno de los acontecimientos mencionados—la renuncia, destitución o muerte del funcionario—el derecho a la suma específica prometida se convirtiera en un derecho adquirido a favor del funcionario o de su representante. No es necesario aducir argumento o cita de autoridades para demostrar, que al disponer de un fondo de tal naturaleza, con anterioridad a la fecha en que ocurra uno de los acontecimientos mencionados, el estado no menoscababa ningún derecho absoluto de propiedad del funcionario de policía. La orden del estado de que los fondos estén a beneficio del funcionario de policía o su representante, bajo ciertas condiciones, estaba sujeta a ser alterada o revocada en cualquier momento, a voluntad de la legislatura. No había contrato alguno por parte del estado de que la disposición de tal fondo permanecería siempre según fué provisto originalmente. *Hasta que ocurra el suceso determinado para que el dinero o parte de éste sea pagado, no existe derecho adquirido alguno en favor del funcionario a recibir tal pago.* Su interés en el fondo era, hasta entonces, una mera es-

peranza creada por la ley, que podía ser revocada o destruída por la misma autoridad. Habiendo sido revocada la ley de abril 1, 1878, antes de la muerte del intestado, su esperanza se convirtió en irrealizable; el dinero con el cual se había de pagar la cantidad reclamada había sido transferido previamente y se había mezclado con otros fondos, y no estaba ya sujeto a las disposiciones de aquella ley. Siendo ésa la naturaleza del interés del intestado en el fondo creado por la Ley de 1878, no existía ningún derecho de propiedad a su favor del cual él o su representante haya sido privado.'' 132 U. S. Rep. 471. (Bastardillas nuestras.)

Los hechos en *Luján* v. *Comisión de la Policía Insular*, supra, eran distintos. Luján se retiró del servicio policíaco con una pensión de $35 mensuales, que le fué concedida bajo la Ley núm. 68 de 16 de julio de 1921. Dicha ley disponía en su sección 15:

"Los retirados del servicio de la Policía Insular, quedarán en el goce de todos sus derechos civiles y podrán desempeñar cualquier cargo electivo o administrativo, sin menoscabo de la pensión de retiro que disfruten."

Al amparo de la disposición que antecede, Luján aceptó un empleo en el Municipio de San Juan, el que ocupó desde enero, 1925, hasta noviembre 30, 1926. La Comisión de la Policía le suspendió el pago de las pensiones desde el 20 de agosto, 1925, hasta noviembre 20, 1926, basándose en la Ley núm. 86 de 20 de agosto de 1925 (pág. 663), que enmendó la núm. 68 de 1921 (pág. 653), agregándole la sección 5 (a), que dice:

"5 (a).—Toda persona pensionada cesará en el goce de su pensión, mientras ocupe cualquier cargo del gobierno federal, insular o municipal, con sueldo o retribución de cualquier clase."

La diferencia notable entre uno y otro caso es que Ward no llegó a adquirir derecho alguno, por haber sido derogada la ley antes de que se cumpliera la condición precedente a su derecho a recibir la pensión, o sea su muerte. Luján se retiró y comenzó a gozar de su pensión y del derecho a ocupar un cargo municipal al amparo de la ley vigente en la

fecha de su retiro. La legislación posterior seguramente le privó de un derecho ya adquirido y del cual había gozado desde enero de 1925 hasta el 20 de agosto del mismo año, fecha en que comenzó a regir la nueva ley.

El caso de *Domenech* v. *Junta de Pensiones*, supra, no puede ser invocado como autoridad para la decisión del caso ante nos. Domenech no había adquirido ningún derecho en la fecha de la derogación del estatuto.

La más reciente decisión de la Corte Suprema Federal en materia de pensiones fué dictada en el caso de *Dodge* v. *Board of Education*, 82 Law Ed. 77 (Advance Op. No. 3), en noviembre 8, 1937, en el que los hechos eran como sigue:

Desde el año 1895 el Estado de Illinois adoptó una ley creando un fondo para el pago de pensiones a los maestros que se retirasen del servicio. El fondo se formó con el producto de contribuciones pagadas por los maestros y con el importe de donativos y legados; y más tarde fué aumentado por el ingreso de intereses y contribuciones. En el año 1926 empezó a regir la "Ley Miller" que proveía para el retiro obligatorio de todos los profesores que tuvieren más de 70 años de edad y disponía que a toda persona que fuera así retirada del servicio activo y que hubiere servido en las escuelas públicas por veinte o más años con anterioridad a la fecha de su retiro, se le pagaría la suma de $1,500 anuales y durante su vida, debiendo hacerse dichos pagos con el dinero procedente de una contribución general impuesta para fines educativos. La ley disponía que ese pago no se hacía en sustitución de sino en adición a la pensión por retiro pagadera bajo la legislación ya existente. En 1927 se enmendó la ley para permitir el retiro de profesores que hubieren servido por 25 años o más y que tuvieren más de 65 años de edad, con paga de $1,000 a $1,500 anuales, según la edad que tuvieren en la fecha del retiro.

En 1935, después de haberse retirado los demandantes del servicio escolar, se adoptó una nueva enmienda por la que se fijaba en $500 anuales la pensión que habrían de recibir

los maestros que se acogiesen al retiro bajo la Ley Miller. La Corte Suprema de Illinois sostuvo que dicha enmienda era aplicable a los maestros que ya se habían retirado desde antes de su aprobación. En la apelación ante la Corte Suprema Federal alegaron los maestros apelantes que la enmienda en cuestión les privaba de derechos adquiridos, de los cuales no podían ellos ser despojados; que la Ley Miller constituía una oferta que cada uno de ellos había aceptado permaneciendo en el servicio hasta su retiro; y que la obligación contractual había quedado perfeccionada y no podía ser menoscabada por legislación posterior. Alegó la parte demandada que no existía obligación contractual alguna; que los pagos que se hacían a los maestros retirados eran pensiones, sujetas a revocación o alteración a voluntad de la Asamblea Legislativa. Al sostener la decisión de la Corte Suprema del Estado, el Tribunal Supremo Federal se expresó así:

"Para determinar si una ley ofrece un contrato a un ciudadano es de capital importancia examinar el lenguaje del estatuto. Si éste provee para el otorgamiento de un contrato escrito a nombre del Estado, en ese caso es clara la obligación contraída por el estado . . . . Por otro lado, una ley que simplemente fija los sueldos de los funcionarios no crea una obligación contractual a favor de éstos y los sueldos fijados pueden ser alterados a voluntad de la Asamblea Legislativa. Esto es cierto también en cuanto a una ley fijando el término o duración de un funcionario público o de un empleado de una agencia del estado. La presunción es que la intención legislativa no ha sido la de crear derechos contractuales privados o derechos adquiridos, sino simplemente la de declarar la política pública que habrá de seguirse hasta que la Asamblea Legislativa resuelva otra cosa. . . . *Si, después de interpretar el estatuto, encontramos que los pagos son dádivas* (gratuities), *que no envuelven un contrato entre las partes, la concesión de esas dádivas no crea ningún derecho adquirido.*" (Bastardillas nuestras.)

Como autoridad para sostener las palabras que hemos puesto en bastardillas se cita el caso de *Pennie* v. *Reis,* supra, en el cual la Corte Suprema Federal, después de enunciar

la doctrina que hemos transcrito anteriormente, al considerar los hechos específicos del caso, dijo:

"Si los dos dólares mensuales que se retenían de la alegada compensación del policía hubiesen sido como cuestión de hecho pagados a él y hubiesen por tanto quedado bajo su absoluto control, y después de hecho tal pago se le hubiese inducido a contribuir cada mes a un fondo con la condición de que, al ocurrir su muerte, mil dólares serían pagados a su representante legal, la cuestión levantada sería diferente en cuanto a la disposición del fondo, o por lo menos en cuanto a la contribución del finado a dicho fondo. En cuanto a ese extremo no se nos ha requerido para que expresemos una opinión. Bastará decir que los dos dólares retenidos al policía cada mes, aunque se diga en la ley que son parte de su compensación, era, en realidad una asignación de esa cantidad hecha por el Estado cada mes para la creación de un fondo para beneficio de los policías mencionados en la ley, y, hasta que sean usados para los fines designados en ella, podían ser transferidos a otras personas o aplicados a otros fines distintos por la Asamblea Legislativa."

De lo expuesto se deduce que tanto la decisión en *Pennie* v. *Reis,* supra, como la dictada en *Dodge* v. *Board of Education,* supra, se basan en el hecho fundamental de que los reclamantes de las pensiones no habían contribuído voluntariamente a la formación del fondo del cual debían ser pagadas las pensiones reclamadas.

La legislación insular en materia de pensiones tuvo su origen en la Ley núm. 22 del 22 de septiembre de 1923, Leyes de ese año, pág. 157. Era dicha ley de carácter opcional, pues sus obligaciones y sus beneficios se hacían extensivos solamente a los funcionarios y empleados "que antes del primero de enero de 1924 no renunciaren a los beneficios de la misma," y disponía además que los que empezaren a servir en o después del primero de diciembre de 1923, podrían renunciar a los beneficios de la ley dentro del término de 30 días contado desde la fecha de su nombramiento. El "Fondo de Pensiones de los Empleados del Gobierno de Puerto Rico" se formó con el producto de una contribución (*tax*) de 2 por ciento sobre los sueldos de todos los emplea-

dos y sobre las pensiones concedidas más los intereses devengados sobre el mismo fondo. Y se autorizaba al Auditor Insular para hacer los descuentos correspondientes y acreditar el producto a una partida denominada "Fondo de Pensiones de los Empleados del Gobierno de Puerto Rico."

El empleado aquí demandante y apelado era ya un empleado de El Pueblo de Puerto Rico en la fecha en que empezó a regir dicha ley y optó por acogerse a ella por el mero hecho de no haber renunciado a sus beneficios antes del 1º. de enero de 1924.

La Ley núm. 104 de 2 de septiembre de 1925, Leyes de ese año, página 949, que derogó expresamente la núm. 22 de 1923, supra, es de carácter compulsorio. Sujeta a sus disposiciones a todos los empleados insulares, con ciertas excepciones, sin dejar al empleado libertad alguna para renunciar los beneficios de la ley y recibir el sueldo íntegro correspondiente a su empleo. Dispone dicha ley que cualquier empleado en servicio que haya prestado por lo menos veinte años de servicios, tendrá derecho a retiro con una pensión vitalicia anual igual al dos por ciento del promedio de sus sueldos anuales durante los siete últimos años de servicios computables, multiplicado por el número de años de servicios. La sección 13 de dicha ley autoriza la deducción y retención del 3 por ciento del sueldo de los empleados y el ingreso del importe de esas deducciones en el Fondo de Retiro. La sección 15 dispone que las cantidades deducidas de acuerdo con la Ley núm. 22 de 1923, más las que se deduzcan y retengan de acuerdo con la nueva ley hasta el 31 de diciembre de 1925 se acreditarán a un fondo especial de reserva que será utilizado solamente para el pago de reintegros, sueldos de empleados y gastos de administración de la Junta de Retiro; y que para el pago de pensiones bajo la nueva ley se utilizarán los fondos de todas clases que ingresen al nuevo fondo denominado "Fondo de Retiro de Empleados del Servicio Civil de Puerto Rico—Fondo de Depósito (*Trust Fund*)."

En el caso citado por el apelado de *Raines* v. *Board of Trustees, etc.*, 7 N. E. 2d 489, la Corte Suprema de Illinois hace el siguiente estudio comparativo entre los dos sistemas de compensación para empleados retirados:

"Toda la dificultad en el presente caso surge de no haber hecho una distinción entre un fondo de pensiones y un fondo de anualidades (*annuitiy fund*) derivado en parte de contribuciones voluntariamente pagadas bajo una opción estatutaria para contribuir o negarse a contribuir. Una *pensión* es por su naturaleza una dádiva que emana de la apreciación y generosidad del soberano, y puede ser otorgada, retenida, distribuída o retirada a su voluntad. (Citas). Por esa razón se ha sostenido que un pensionista no tiene ningún derecho adquirido sobre el fondo de pensiones. Se ha sostenido también que el carácter de un fondo de pensiones no se altera por contribuciones compulsorias por medio de deducciones de los sueldos o jornales de los funcionarios y empleados públicos. Se dice que tales pagos al fondo no son en realidad pagos hechos por el funcionario o empleado, y el empleo se acepta con el conocimiento de que ciertas cantidades serán deducidas cada mes e ingresadas en el fondo de pensiones; que el dinero no es primeramente segregado de los fondos públicos para convertirse en propiedad privada y ser después ingresado en el fondo de pensiones, sino que es separado o transferido de un fondo público a otro, y continúa siendo dinero del público sobre el cual la persona de cuyo sueldo se hizo la deducción no tiene el control, y al cual no tiene derecho. (Citas, entre ellas *Pennie* v. *Reis*, supra). . . . Dicho fondo es en todo tiempo dinero público para ser desembolsado como una dádiva o retirado a voluntad y libre de derecho alguno a favor del pensionista.

"Existe una amplia diferencia entre contribuir voluntariamente a un fondo, de acuerdo con un derecho opcional estatutario, y ser compelido a sufrir deducciones sin tal derecho. En el último caso el funcionario o empleado no tiene voz en la determinación de si sufrirá o no tales deducciones. Éstas son impuestas por el estatuto y se hacen aun en contra de su voluntad. En el otro caso se deja enteramente a su elección. Él puede optar por acogerse a los términos de la ley y recibir sus beneficios, o puede optar por renunciar ese privilegio, sin otro efecto que el privarle de participar del fondo. Si no opta por contribuir, él recibe y retiene para sí la totalidad de su salario o jornal. Si opta por contribuir, las cantidades son deducidas de acuerdo con su mandato. El efecto es el mismo

que si su salario completo le fuese pagado y después de haberse convertido en su propiedad él contribuyese al fondo de retiro. En tal caso no existe razón ni autoridad para sostener que el fondo continúa siendo dinero público en el cual él no tiene derecho o interés.

"En los casos de estatutos que crean un fondo de retiro, por virtud de los cuales es opcional para los maestros acogerse a sus disposiciones mediante la deducción de una cierta cantidad de sus salarios, se sostiene que de la elección a participar en el fondo surge una relación contractual, cuyos términos pueden fijarse mediante referencia al estatuto. (Citas) . . . .

"Las relaciones entre los contribuyentes voluntarios y el soberano siendo contractuales, la consecuencia es que los derechos creados no son medidos por los derechos de los pensionistas. Son similares y equivalen, en efecto, a contratos de seguro proveyendo anualidades al vencimiento del contrato o póliza de seguro. La base de dichas anualidades es la misma de cualquier otro contrato. La consideración es la oferta del soberano, la aceptación de la oferta, y el cumplimiento de sus términos. . . . En los contratos basados en contribuciones opcionales y voluntarias, los contribuyentes tienen un interés sustancial en el fondo por virtud de las contribuciones pagadas al mismo bajo los términos del contrato. Los beneficios a obtener no son dádivas de fondos públicos por servicios prestados."

El caso de autos es distinto en sus hechos a los tres casos que hemos examinado. En *Pennie* v. *Reis,* supra, la contribución al fondo no era opcional, y, además, el fallecimiento de Ward ocurrió después de la enmienda a la Ley de Pensiones, o sea la enmienda se hizo antes de que Ward hubiese adquirido derecho alguno bajo la ley anterior. En *Dodge* v. *Board of Education,* supra, los reclamantes no habían contribuído en forma alguna al fondo creado por la ley Miller, fondo que se nutría con el producto de una contribución especial para fines escolares. La decisión en *Raines* v. *Board of Trustees,* supra, se basa en el carácter opcional y voluntario de las contribuciones al fondo de pensiones.

En el caso de autos el empleado peticionario y apelado era ya un empleado público desde muchos años antes de empezar a regir la Ley núm. 22 de 22 de septiembre de 1923. Al optar por acogerse a sus beneficios surgieron relaciones con-

tractuales entre dicho empleado y el Gobierno, por virtud de las cuales el empleado adquirió un derecho embrionario y no *vested* a que se le pagasen las pensiones provistas por la ley cuando se cumplieran las condiciones por ella fijadas para poder disfrutar de tales pensiones. Desapareció ese derecho embrionario al ser sustituída y derogada la Ley núm. 22, supra, por la núm. 104 de 2 de septiembre de 1925, que era de carácter compulsorio y no concedía opción alguna, ni a los que ya eran empleados en esa fecha ni a los que aceptaran un empleo en el futuro, para renunciar los beneficios de la ley y poder percibir sus sueldos sin deducción alguna.

De acuerdo con la jurisprudencia que hemos examinado, no tenemos duda alguna de que la Asamblea Legislativa tenía la facultad de disponer a su arbitrio del fondo de pensiones en cualquier momento antes de que se cumplieran todas las condiciones que daban derecho al peticionario apelado a disfrutar de una pensión; y que esa facultad cesó desde el momento en que dichas condiciones quedaron cumplidas y especialmente desde que la Junta de Retiro tomó acción oficial y otorgó al peticionario la pensión de que estuvo disfrutando durante los cuatro años que precedieron a la aprobación de la nueva ley. Véanse: *Kavannagh* v. *Board of Police Commissioners,* supra; *Cohrn* v. *Henderson,* 19 Cal. App. 89, 90; *Sheehan* v. *Board of Police Commissioners,* 47 Cal. App. 29; *O'Dea* v. *Cook et al.,* 176 Cal. 659; y *Klench* v. *Board of Pension Fund Commissioners,* 249, P. 46.

Cuando el peticionario se retiró voluntariamente del servicio el 14 de septiembre de 1931, todas las condiciones exigidas por la legislación vigente en esa fecha, para darle derecho a una pensión de $2,000 anuales, se habían cumplido. El peticionario había dedicado más de 30 años de su vida al servicio de la comunidad y ésta le había pagado durante los últimos siete años un sueldo promedio de $3,129. Basándose en el cumplimiento de esos requisitos, y actuando de acuerdo con las disposiciones de la sección 3 de la Ley núm. 104 de 2 de septiembre de 1925, según fué enmendada por la Ley núm.

73 de mayo 6 de 1930 (pág. 451) la Junta de Pensiones extendió al peticionario carta de jubilación y le reconoció oficialmente el derecho que había adquirido a retirarse del servicio y a gozar durante el resto de su vida de una pensión anual de $2,000. Desde el momento en que la Junta de Pensiones adjudicó al peticionario la pensión y éste la aceptó retirándose del servicio, el derecho a continuar recibiendo dicha pensión se convirtió en un *vested right,* del cual no puede ser despojado el peticionario por ninguna legislación posterior.

Por las razones expuestas opinamos que la sección 11 de la Ley núm. 23 de 16 de julio de 1935 ( (2) pág. 127) es inconstitucional por cuanto trata de privar al peticionario de un derecho adquirido y del que ha venido disfrutando al amparo de la legislación anterior.

*Debe confirmarse la sentencia recurrida.*

El Juez Asociado Señor Córdova Dávila no intervino.