568

RAFAEL BUSCAGLIA, TESORERO DE PUERTO RICO, peticionario, v. TRIBUNAL DE CONTRIBUCIONES DE PUERTO RICO, demandado; ANTONIO RIERA, interventor.

Núm. 115.—*Sometido:* Mayo 8, 1947. *Resuelto:* Julio 9, 1947.

*Hon. Procurador General Luis Negrón Fernández* y *Edgar S. Belaval*, abogado especial éste del Departamento de Justicia, abogados ambos del peticionario; *Eulogio Riera*, abogado del interventor, querellante en el pleito principal.

EL JUEZ ASOCIADO SEÑOR TODD, JR., emitió la opinión del tribunal.

El Tesorero de Puerto Rico notificó una deficiencia al contribuyente Antonio Riera para el año contributivo termi-

nado en 31 de diciembre de 1944 por haber éste deducido de su ingreso bruto la suma de $208 que le fué retenida por el Auditor de Puerto Rico del sueldo que devengara en dicho año del Gobierno Insular como abogado de la Autoridad de Tierras de Puerto Rico.([1]) El 50 por ciento de dicha suma representa el 3 por ciento del sueldo de Riera y fué retenido para ingresar al Fondo de Ahorro y Préstamo de los Empleados del Gobierno Insular de Puerto Rico creado a virtud de la Ley núm. 52 de 11 de julio de 1921 (pág. 375), según enmendada subsiguientemente, y el otro 50 por ciento representa el 3 por ciento de dicho sueldo retenido para ser acreditado en los libros de la Tesorería de Puerto Rico a la cuenta denominada "Fondo de Retiro de los Funcionarios y Empleados del Servicio Civil de Puerto Rico" a virtud de la Ley núm. 23 de 16 de julio de 1935 ((2) pág. 127), según enmendada posteriormente. Denegada la reconsideración solicitada el contribuyente presentó una querella ante el Tribunal de Contribuciones, la cual fué declarada con lugar por dicho Tribunal a virtud de la decisión rendida en un caso similar de Celestino Domínguez Rubio. A petición del Tesorero expedimos el presente auto para revisar la decisión recaída.

Sostiene el peticionario que el Tribunal de Contribuciones erró al resolver que los descuentos hechos del sueldo del interventor no constituyen un ingreso del empleado, sujeto al pago de contribución sobre ingresos.

De acuerdo con la sección 15(a) de la Ley de Contribuciones sobre Ingresos, el término "ingreso bruto" incluye, entre otras cosas, ". . . ingresos derivados de sueldos, jornales, o compensación por servicios personales (incluyendo en el caso de funcionarios y empleados de El Pueblo de Puerto Rico, de los Estados Unidos o de cualquier subdivi-

---

([1])Es un hecho admitido que el contribuyente al computar su ingreso neto lo hizo a base de lo cobrado y pagado (*cash basis*) durante el año.

sión política de los mismos, la retribución que como tales *rè-ciban*) de cualquier clase y cualquiera que sea la forma en que *se pagare . . .''* (Bastardillas nuestras.)

Arguye el peticionario que si bien el interventor no recibió ni se le pagó el sueldo completo a que tenía derecho, al aceptar su cargo sabía que tenía que acogerse compulsoriamente a los términos de las leyes números 23 de 16 de julio de 1935 y 52 de 11 de julio de 1921, según enmendadas, y que a virtud de los beneficios que estas leyes le conceden adquirió ciertos derechos de cierto valor que equivalen a haber recibido la paga de su sueldo completo; que dichas leyes formaban parte del contrato de empleo entre el interventor y el Gobierno Insular y al aceptar su nombramiento voluntariamente aceptó los descuentos provistos en dichas leyes.

Los derechos a que hace referencia el peticionario son los siguientes:

Ley núm. 52 de 1921:

'' . . . el derecho a que se les reembolsaran las cantidades descontadas en caso de renuncia o quedar cesantes y de que dichas cantidades se les reembolsaran a sus herederos en caso de muerte (Ley núm. 52 de 1921, según fué enmendada por la Ley núm. 150 de 1937); el derecho a obtener préstamos equivalentes al sueldo de un mes, previa aprobación de sus jefes y de la Junta Directiva (Ley núm. 52 de 1921, sección 8, según fué enmendada por la Ley núm. 96 de 1925), pagaderos en plazos no menores del 10 por ciento del sueldo (Ley núm. 52 de 1921, sección 9, según fué enmendada por la Ley núm. 96 de 1925), con intereses al 6 por ciento anual, (Ley núm. 52 de 1938, Sesión Especial (*sic*)); el derecho a obtener préstamos extraordinarios, de más de un mes de sueldo, bajo ciertas circunstancias (Ley núm. 52 de 1921, sección 11, según fué enmendada por la Ley núm. 199 de 1942); el derecho a obtener préstamos mayores en casos especiales (Ley núm. 52 de 1921, sección 13, según fué enmendada por la Ley núm. 150 de 1937); el derecho a un seguro de muerte o inutilidad física, a opción del empleado (Ley núm. 52 de 1921, sección 20, según fué enmendada por la Ley núm. 199 de 1942); el derecho a continuar bajo ciertas circunstancias, el seguro de vida aun después de haber renunciado o haber sido separado del cargo (Ley núm. 52 de 1921, sección 21, según fué enmendada por la Ley

núm. 150 de 1937) ; el derecho, si no deseaba seguir con el seguro al ser separado de su cargo o al renunciar, a que le reembolsaran, además de su cuenta de ahorros, el 50 por ciento del total de las cuotas que hubiese pagado por concepto del seguro de vida (Ley núm. 52 de 1921, sección 22) ; el derecho a obtener préstamos hipotecarios y el derecho a establecer cooperativas para la edificación de casas (Ley núm. 52 de 1921, sección 23, según fué enmendada por la Ley núm. 108 de 1939) ; y, el derecho a que cualesquiera cantidades que recibiera bajo esta ley estuviesen exentas de embargo o ejecución (Ley núm. 52 de 1921, sección 26, según fué enmendada por la Ley núm. 150 de 1937).''

Y bajo la Ley núm. 23 de 1935 (II) :

'' . . . el derecho a una renta vitalicia al retirarse del servicio, por edad, incapacidad física, años de servicio o por separación involuntária (Ley núm. 23 de 1935 (II), secciones 4, 5, 6, 7 y 8); el derecho, en caso de renuncia o muerte antes del retiro, a la devolución de las cuotas pagadas, con intereses al 3 por ciento, y, el derecho a que la renta vitalicia estuviese libre de embargos o contribuciones (Ley núm. 23 de 1935 (II), sec. 17). Además los fondos aportados por los empleados eran aumentados por una asignación anual hecha por el Gobierno Insular (Ley núm. 23 de 1935 (II), sec. 20), según fué enmnedada por la Ley núm. 995 de 1938).''

Consideraremos en primer término el concepto que, de acuerdo con la jurisprudencia, tienen los fondos recaudados a virtud del descuento obligatorio hecho a los empleados en un sistema de pensiones como el establecido por la Ley núm. 23 de 16 de julio de 1935.

Los fondos a que están acreditados en Tesorería los descuentos que se hacen a los funcionarios y empleados bajo esta ley, constituyen fondos públicos del Gobierno. Así se resolvió en el caso de *Pennie* v. *Reis,* 132 U. S. 464, al interpretar un estatuto de California, similar a la ley que consideramos, en el cual se proveía que el sueldo de los miembros de la policía de la ciudad de San Francisco sería de $102 mensuales pero se autorizaba al tesorero de dicha ciudad a ''retener del sueldo de cada policía la suma de dos dólares al mes, para ser ingresados en un fondo que se conocería como

'el fondo de seguro de vida y salud policíaco.' '' La ley proveía que al ocurrir la muerte de cualquier miembro de la fuerza policíaca se pagaría por el tesorero, de dicho fondo, a sus representantes legales la suma de mil dólares o si el policía renunciaba debido a mala salud o inhabilidad física, se le pagaría la suma de lo por él contribuído al fondo., Once años después de estar en vigor esta ley la legislatura aprobó el 4 de marzo de 1889 otra ley estableciendo el Fondo de Seguro de Vida y Salud y de Pensiones de la Policía para todos los condados, ciudades y pueblos del estado. Para formar parte de dicho fondo la ley transfirió los fondos existentes a virtud de los descuentos hechos bajo la ley anterior. La nueva ley varió la forma y la cuantía de los pagos a realizarse por pensiones y seguros a los miembros de la fuerza policíaca en el estado.

Al fallecer un policía el 13 de marzo de 1889 (nueve días después de estar en vigor la nueva ley) que había prestado servicios desde el año 1869 y de cuyo sueldo de $102 se habían descontado los dos dólares mensualmente desde que se aprobó la primera ley en 1878, el administrador de sus bienes solicitó se le pagara la suma de mil dólares que se fijaba como seguro en dicha ley. Al serle denegada solicitó de la corte se expidiera un auto de *mandamus* contra el tesorero. La corte Suprema de California declaró con lugar una excepción previa a la petición y la Corte Suprema de Estados Unidos al confirmar la sentencia se expresó en estos términos:

'' . . . No obstante, por lo tanto, que en este caso el peticionario alega que el policía fallecido contribuyó de su sueldo con dos dólares mensuales de acuerdo con la ley en cuestión, y, en substancia, que el fondo que había de pagar los mil dólares reclamados fué creado de contribuciones similares de los miembros de la policía, la corte, mirando al estatuto, ve, que de hecho, ningún dinero fué contribuído por el policía de su sueldo, sino que el dinero que ingresó en dicho fondo bajo la ley del primero de abril de 1878, era dinero del estado retenido en su posesión para la creación de este mismo fondo, y el balance—cien dólares—fué la única compensación pagada al policía. Aunque llamada parte de la compensación del policía, él nunca la

recibió o la controló, ni podía evitar su asignación al fondo en cuestión. No tenía tal poder para disponer de ella como la tiene el que es dueño de una propiedad. El efecto legal del estatuto es que el policía recibirá una compensación mensual de no más de cien dólares, . . . y que en adición el Estado creará un fondo asignando dos dólares cada mes para dicho fin. . .

"Siendo un fondo creado en esa forma, estaba enteramente a disposición del Gobierno hasta que al ocurrir alguno de los eventos mencionados—la renuncia, destitución o muerte del funcionario—el policía o su representante adquirió un derecho a la suma específica prometida. No se requiere argumento o cita de autoridades para demostrar, que al disponer de un fondo de dicho carácter, antes de ocurrir alguno de los eventos mencionados, el Estado no menoscabó ningún derecho absoluto de propiedad del policía. La disposición del Estado de que el fondo sería uno para beneficio del policía o su representante, bajo ciertas condiciones, estaba sujeta a cambio o revocación en cualquier momento, a voluntad de la Legislatura. No había ningún contrato por parte del Estado en el sentido de que su disposición continuaría siempre en la forma originalmente provista. Hasta que ocurriera el evento particular a virtud del cual el dinero o parte del mismo debía pagarse, no existía ningún derecho adquirido (*vested right*) en el policía a tal pago. Su interés en el fondo era, hasta entonces, una mera espectativa creada por ley, y sujeta a ser revocada o destruída por la misma autoridad. Habiendo sido derogada la ley del primero de abril de 1878 antes del fallecimiento del causante; su espectativa nunca pudo realizarse, el dinero con que habría de pagarse la cantidad reclamada había sido previamente transferido y mezclado con otro fondo, y no estaba ya sujeto a las disposiciones de dicha ley. Siendo ésta la naturaleza del interés del causante en el fondo provisto por la ley de 1878, no existía en él ningún derecho de propiedad del cual él y su representante hubieran sido privados."

Termina diciendo esta opinión que si como cuestión de hecho se hubieran pagado los dos dólares mensuales al policía y hubieran estado bajo su control absoluto y entonces hubiera sido inducido a contribuirlos al fondo bajo la condición de que, a su muerte, se pagarían los mil dólares, una cuestión distinta surgiría sobre la cual el tribunal no expresa opinión, pero termina diciendo que "Es suficiente que los dos dólares retenidos al policía mensualmente, aunque llamados en la ley

parte de su compensación, eran, de hecho, una asignación de
esa cantidad hecha por el Estado cada mes para la creación
de un fondo para beneficio de los policías mencionados en la
ley, y, hasta que sean usados para los fines designados en
ella, podían ser transferidos a otras personas o dedicados por
la legislatura a otros fines distintos.''

En el caso de *Dogde* v. *Board of Education,* 302 U. S. 74,
se resolvió que una ley que meramente fija los sueldos de
funcionarios no crea ningún contrato a su favor y la com-
pensación fijada puede ser alterada a su voluntad por la le-
gislatura y además, citando el caso de *Pennie,* supra, que ''Si,
al interpretar el estatuto, se llega a la conclusión de que los
pagos son dádivas (*gratuities*), que no envuelven un convenio
entre las partes, su concesión no crea ningún derecho ad-
quirido.''

En los casos de *Luján* y. *Comisión de la Policía Insular,*
38 D.P.R. 58, y *Domenech* v. *Junta de Pensiones,* 42 D.P.R.
604, resolvimos, citando entre otros casos el de *Pennie,* supra,
que los descuentos hechos a los funcionarios y empleados del
Gobierno Insular para el fondo de pensiones no constituyen
un derecho adquirido a la pensión que no pueda ser variado
o derogado por la legislatura.

En el caso de *Fernández* v. *MacLeod,* 52 D.P.R. 899, tra-
tamos de distinguir la jurisprudencia antes citada por el
hecho de que el funcionario público a quien ya se había con-
cedido una pensión tenía un derecho adquirido que no podía
ser afectado por una ley posterior que reducía su pensión.
Empero, la Corte de Apelaciones para el Primer Circuito
revocó nuestra decisión(²) basándose, entre otros, en los ca-
sos de *Dodge* v. *Board of Education,* supra, y en el de *City
of Dallas* v. *Trammell,* 129 Tex. 150, 101 S. W.2d 1009, 112
A.L.R. 997. Aplicando lo resuelto en este último dijo (pág.
25): ''Se resolvió en el caso de *Dallas,* supra, que cuando la
contribución es obligatoria el fondo así contribuído al con-

---

(²)*MacLeod* v. *Fernández,* 101 F.2d 20.

ceder una pensión del mismo constituye meramente la transferencia de un fondo público a otro, ya que la contribución obligatoria y pago nunca están en posesión o control del empleado o funcionario, mientras que en el caso de una contribución voluntaria, la contribución llega a ser propiedad del empleado o funcionario y hasta ese extremo, por lo menos, él puede tener un derecho adquirido en el fondo. En el caso de contribuciones obligatorias el fondo nunca cambia del *status* de fondos públicos, *el gobierno tiene un derecho absoluto para disponer del mismo, y el empleado nunca adquiere ningún derecho en el mismo, ya que está sujeto al control del gobierno y puede ser enmendado o derogado por legislación posterior."* (Bastardillas nuestras.)

Cualquiera que sea nuestra manera de pensar sobre el caso de *McLeod* v. *Fernández*, (³) su razonamiento, así como el de los demás casos antes citados, contesta el argumento del peticionario en cuanto a que los descuentos obligatorios hechos al interventor constituyen parte de su sueldo recibido por el hecho de que puede en el futuro recibir ciertos beneficios. Tampoco puede prevalecer la contención del peticionario de que existe una relación contractual entre el interventor y el Gobierno Insular a virtud de haber aceptado su empleo a sabiendas de que se le harían los descuentos para los fondos antes mencionados.

█ Cita el peticionario el caso de *Miller* v. *Commissioner of Internal Revenue*, 144 F.2d 287 (C.C.A. 4th. 1944), resuelto por la Corte de Contribuciones de Estados Unidos bajo el nombre de *Cecil W. Taylor*, 2 T. C. 267, en el cual se resolvió que las deducciones hechas del sueldo de un empleado para el fondo de Retiro del Servicio Civil Federal formaban parte de su sueldo, sujeto al pago de contribución sobre ingresos. Este caso es distinguible del de autos. La propia Corte de Contribuciones de Estados Unidos al fallarlo en primera instancia a su vez lo distinguió de los que hemos citado anteriormente diciendo:

---

(³) Véase *Esteves* v. *Junta de Retiro*, 60 D.P.R. 98.

"Cuestiones de esta naturaleza general han llegado en una ocasión u otra ante ésta y otras cortes estatales, pero las decisiones no son uniformes y particularmente a la luz de la interpretación de legislación conteniendo distintas disposiciones y su aplicación a situaciones que presentaban hechos distintos, sería ocioso asegurar que fueran una ayuda eficaz para resolver los presentes procedimientos. Tampoco casos como *Pennie* v. *Reis,* 132 U.S. 464; *Dodge* v. *Board of Education,* 302 U.S. 74, o *MacLeod* v. *Fernández* (C.C.A. 1), 101 F.(2d) 20; certiorari denegado, 308 U.S. 561, son determinativos de la cuestión ante nos. El caso de *Pennie* interpretó un estatuto de California allí en controversia que eliminaba enteramente del sueldo básico del empleado cantidades retenidas como aportaciones al fondo de pensiones del estado. No estamos convencidos de que ésa sea una interpretación permisible de la Ley de Retiro Federal que define el 'sueldo, paga o compensación básica' como 'la paga básica del puesto según fijada por ley o reglamento.' El caso de *Dodge* v. *Board of Education* es inaplicable, como se dijo en *Abrahams* v. *Wilson,* supra, que se refiere a 'la disimilitud del caso de *Dodge,* donde el fondo del cual la pensión estaba en discusión era contribuído enteramente por el estado y no ayudado por contribuciones de los maestros . . .' Y el caso de *MacLeod* se distingue por lo menos por la aparente ausencia del estatuto de Puerto Rico allí bajo consideración de disposición alguna para crear una cuenta que acreditara a favor del empleado las sumas retenidas de su sueldo, y por la circunstancia adicional de que la única cuestión envuelta era si la paga mensual al empleado después de su retiro podía ser rebajada de la suma fijada a la fecha de su retiro y no si existía autoridad para privar al empleado de beneficios mínimos consistentes en el valor de las contribuciones al fondo que eran equivalentes de las sumas retenidas." 2 T.C. 267, 273.

La diferencia sustancial existente entre la Ley de Retiro Federal y la que aquí consideramos estriba en el hecho de que el descuento hecho a virtud de aquélla no sólo pasa a formar parte del "fondo de retiro e incapacidad del servicio civil" sino que la propia ley dispone que dicho fondo queda "asignado para el pago de rentas vitalicias (*annuities*), reembolsos y concesiones provistas en esta Ley," y que, de acuerdo con la sección 12(*a*) las sumas retenidas "se acreditarán a una cuenta individual de tal empleado, a ser man-

tenida por el departamento u oficina que lo emplea. . . .'"
La Ley núm. 23 de 1935, según enmendada, no contiene tales;
disposiciones. La Corte del Cuarto Circuito, en el caso de:
*Miller*, hizo suya la interpretación dada por la Corte de Con-
tribuciones a la ley al decir a la pág. 289 que ''Estos aspec-
tos ·del plan de retiro nos parece demostrar que se han
comprado por el empleado derechos substanciales, de un valor
que en modo alguno puede ser materialmente menor a la suma
de su propia contribución, que al presente le pertenecen, y
que están inequívocamente provistos para su beneficio defi-
nitivo (*ultimate*) bajo cualquier contingencia o en cualquier
circunstancia que la ocasión para dicho beneficio pueda sur-
gir. Son a ese respecto comparables a, y para nuestros fines
indistinguibles de, un contrato de renta vitalicia, del cual
el patrono se constituye en expedidor, separando reservas
para dicho fin y haciendo inversiones de las mismas compara-
bles a aquellas efectuadas por compañías que se dedican a
ese negocio.'' Y continúa diciendo entonces la Corte de Cir-
cuito: ''Las decisiones en casos en que un patrono ha pagado
premios sobre pólizas de seguro de vida expedidas para bene-
ficio del empleado son aplicables. En tales casos se resuelve
que la cantidad pagada como premio se presume que es una
compensación adicional por los servicios del empleado y cons-
tituye ingreso de éste bajo la teoría de que ha recibido un
beneficio en la forma de protección por seguro en lugar de:
paga en efectivo. (Citas).''

A diferencia de lo resuelto en el caso de *MacLeod* v. *Fer-
nández,* supra, en el de *Miller* v. *Commissioner,* que comen--
tamos, la Corte del Cuarto Circuito resolvió que el empleado
bajo la Ley de Retiro Federal tiene un derecho adquirido
(*vested right*) consistente en la renta vitalicia al retirarse y
a que se le devuelva la suma retenida de su sueldo, con inte-
rés, al ser separado del servicio o al morir y que ''Estos
derechos estaban asegurados en consideración a las contri-
buciones hechas de su sueldo y por lo menos hasta el límite

de tales contribuciones, *no podrán serle quitados bajo las disposiciones de la ley y no podemos presumir que el Congreso, si pudiera hacerlo, cambiaría la ley para privarle de los derechos substanciales adquiridos bajo la misma,* . . ." 144 F.2d 287, 290. (Bastardillas nuestras.)

Como sabemos, en el caso de *MacLeod* v. *Fernández,* la Corte del Primer Circuito al interpretar nuestra ley de retiro expresamente resolvió que no existía ningún derecho adquirido a favor de un empleado que percibía una pensión bajo dicha ley y que la Legislatura de Puerto Rico podía variar sus términos a su voluntad y hasta disponer del fondo en forma absoluta.

Cualquiera que sea el peso que nos merezca la decisión del caso de *Miller,* supra, estamos obligados a seguir la pauta señalada por la Corte de Apelaciones para el Primer Circuito. Además la diferencia existente entre la Ley de Retiro Federal y la nuestra, señalada anteriormente, demuestra que dicho caso y el de autos pueden ser distinguidos, como lo hizo la Corte de Contribuciones de Estados Unidos al diferenciar el de *MacLeod* v. *Fernández.*

Somos de opinión que el Tribunal de Contribuciones no erró al resolver que las deducciones hechas al sueldo del interventor bajo la Ley núm. 23 de 1935 no forman parte de su ingreso bruto tributable bajo la Ley de Contribuciones sobre Ingresos.

¿Puede decirse lo mismo en cuanto al descuento hecho bajo la Ley núm. 52 de 11 de julio de 1921, según enmendada posteriormente? Creemos que no.

Si bien bajo los términos de esta ley el descuento que se hace a los empleados para el Fondo de Ahorro y Préstamo, también es compulsorio, el carácter del mismo es distinto al del Fondo de Pensiones bajo la Ley núm. 23 de 1935, no por interpretación judicial insular o federal, sino por expresión terminante de la Asamblea Legislativa de Puerto Rico.

El 1ro. de mayo de 1929 se aprobó la Resolución Conjunta(⁴) núm. 39 (Leyes de 1929, pág. 473) cuyo título es el siguiente:

"Para autorizar a la Junta de Directores de la Asociación Fondo de Ahorro y Préstamo de los Empleados del Gobierno Insular de Puerto Rico, a distribuir los intereses acumulados al presente y los que se recauden en el porvenir, por virtud de préstamos y depósitos en los bancos de los fondos de la Asociación, entre los empleados asociados, *conforme la cantidad que éstos tengan en su cuenta de ahorro, el día 30 de junio de 1929, y para otros fines.* (Bastardillas nuestras.)

El primero, tercero y cuarto Por Cuantos de dicha resolución dicen así:

"POR CUANTO, la Asociación Fondo de Ahorro y Préstamo de los Empleados del Gobierno Insular de Puerto Rico *es un plan cooperativo,* que funciona bajo los auspicios del Gobierno, por virtud de legislación aprobada por la Asamblea Legislativa de Puerto Rico;
"\*  \*  \*  \*  \*  \*  \*
"POR CUANTO, el banco donde se hacen los depósitos de los fondos generales de la Asociación de Ahorro y Préstamo de los Empleados del Gobierno Insular de Puerto Rico, abona intereses que van a engrosar los fondos de la asociación;
"POR CUANTO, *los fondos* pertenecientes a la Asociación Fondo de Ahorro y Préstamo de los Empleados del Gobierno Insular de Puerto Rico, *son de la pertenencia exclusiva de los empleados asociados;* etc."

Dispone entonces la resolución en su sección primera:

"Que el balance que por concepto de intereses de los préstamos y de los depósitos en el banco resulte el 30 de junio de 1929, correspondiente al año fiscal 1928–29, se sume al remanente anterior, que en primero de julio de 1928 ascendía a $51,570.62, y se declare el

---

(⁴)Esta resolución conjunta, al igual que todas y cada una de las aprobadas en cualquier fecha por la Asamblea Legislativa de Puerto Rico con anterioridad al 16 de junio de 1938, fué aprobada, ratificada y confirmada en todas sus partes por el Congreso de los Estados Unidos al aprobar en la fecha mencionada la Ley núm. 641, y se le dió el mismo efecto, validez y efectividad como si originalmente hubiera sido decretada válidamente y aprobada por el Gobernador en forma de "Ley". Esta acción congresional fué efecto de la decisión en el caso de *Valiente & Co.* v. *Sancho Bonet, Tes.,* 50 D.P.R. 586, confirmada en *Sancho* v. *Valiente & Co.,* 93 F.2d 327 (C.C.A. 1st, 1937.)

dividendo proporcional correspondiente al tanto por ciento que dicha suma represente sobre el total de las cantidades ahorradas por los empleados acogidos a los beneficios de la Ley No. 52 de 1921, según, fué enmendada por la Ley No. 96 de 1925. *Este dividendo se acreditará a una cuenta especial que se denominará 'Cuenta de Dividendos.'*

"En lo sucesivo, y a la terminación de cada año fiscal, el total neto obtenido por concepto de intereses, después de descontados los gastos de administración, *será dividido entre el total de los fondos ahorrados, y se procederá a acreditarlo en igual forma que en el año anterior en la 'Cuenta de Dividendos';* Disponiéndose, que en cualquier tiempo que un empleado falleciere o dejare de pertenecer a la Asociación por cualquier motivo de acuerdo con las prescripciones de la Ley No. 52 de 1921, según fué enmendada en 1925, tendrá derecho a recibir como beneficio, *además de sus ahorros, una cantidad igual al tanto por ciento declarado como dividendo para cada año sobre el total de sus ahorros en dicho año,* más el tanto por ciento que represente el primer dividendo que se declare sobre el total de la cantidad que tenía ahorrado el 30 de junio de 1929, si en dicha fecha era un miembro de la Asociación." (Bastardillas nuestras.)

Las disposiciones citadas demuestran la diferencia fundamental que existe entre el fondo creado a virtud de la Ley núm. 52 de 1921 y el Fondo de Pensiones creado por la Ley núm. 23 de 1935. La Asamblea Legislativa ha reconocido expresamente que los fondos de la Asociación Fondo de Ahorro y Préstamo de los Empleados del Gobierno Insular de Puerto Rico son de la pertenencia exclusiva de los empleados asociados ya que dicha Asociación constituye un plan cooperativo de dichos empleados el cual funciona bajo los auspicios del Gobierno a virtud de la Ley núm. 52 de 1921. Reconoce y autoriza además dicha resolución conjunta, hoy ley, que dichos fondos se acreditan a una cuenta de ahorros a nombre de cada empleado y que, además, se acreditan anualmente a una cuenta de dividendos de cada empleado una cantidad igual al tanto por ciento declarado como dividendo para cada año sobre el total de sus ahorros en dicho año, siendo la fuente de dicho dividendo el total neto de los intereses obtenidos de los préstamos hechos a los empleados más los in-

tereses pagados por el banco donde están depositados los fondos de la Asociación, después de descontarse los gastos de administración.

Somos de opinión que la intención legislativa quedó claramente expresada en el sentido de que el fondo creado a virtud de la Ley núm. 52 de 1921 no tiene el carácter de fondo público del cual pueda disponer el Gobierno sino que se reconoció, desde el año 1929, que dicho fondo es de pertenencia exclusiva de los empleados que con el descuento del 3 por ciento de sus salarios contribuyen al mismo. Tenemos, además, bajo esta ley, una disposición similar a la contenida en la ley federal objeto de interpretación en el caso de *Miller,* supra, al efecto de que a cada empleado se le acredita en una cuenta a su nombre el montante de sus ahorros y de los dividendos anuales y que al cesar como empleado (o al fallecer, su sucesión) tiene derecho a que se le devuelvan íntegros dichos ahorros y dividendos. Éstos sí constituyen derechos adquiridos (*vested rights*) del empleado y no podemos presumir que la Asamblea Legislativa, si pudiera hacerlo, cambiaría la ley para privarle de dichos derechos. *Cf. Miller* v. *Commissioner of Internal Revenue,* supra.

Somos de opinión que el Tribunal de Contribuciones erró al resolver que las deducciones hechas al sueldo del interventor bajo la Ley núm. 52 de 1921, no forman parte de su ingreso bruto tributable y *en su consecuencia se modifica la resolución recurrida en el sentido de que el peticionario tiene derecho a cobrar la deficiencia que corresponde a dichas deducciones, y así modificada, se confirma.*

El Juez Asociado Sr. Snyder disiente en tanto en cuanto este Tribunal resuelve que los fondos cotizados por los empleados públicos al Fondo de Pensiones del Gobierno Insular no forman parte del ingreso bruto de dichos empleados, tributable bajo la Ley de Contribuciones sobre Ingresos.