EL PUERTO DE PUERTO RICO, denunciante y apelado, *v.* TOMÁS GALLETI RODRÍGUEZ, acusado y apelante.

Número: CR-62-186          Resuelto: 3 de mayo de 1963

*Rafael Toro Cubergé,* abogado del apelante; *J. B. Fernández Badillo, Procurador General,* y *Juan A. Faría, Procurador General Auxiliar,* abogados de El Pueblo.

Sala integrada por el Juez Asociado Señor Belaval como Presidente de Sala y los Jueces Asociados Señores Hernández Matos y Santana Becerra.

EL JUEZ ASOCIADO SEÑOR BELAVAL emitió la opinión del Tribunal.

El día 28 de agosto de 1960, entre las siete y media y ocho y menos cuarto de la noche, dos automóviles chocaron en la intersección que forman las calles Mattei Lluveras y

Pasarell del pueblo de Yauco. El automóvil del testigo de El Pueblo de Puerto Rico, Sr. Luis Pérez Pérez iba en dirección oeste a este y el automóvil del acusado subía de sur a norte. Según el testigo del Pueblo en el momento del accidente estaba lloviendo—"la verdad es que la visibilidad no estaba muy clara que digamos porque estaban las luces encendidas y el encendido del pueblo no dejaba ver" (T.E. págs. 14–15). En cuanto a quién le dio a quién, el testigo del Pueblo, declaró: "Vamos a decir nos dimos" (T.E. pág. 15). Después de la colisión, discutieron; el acusado estaba "como está generalmente el que tiene una colisión, excitado. Es una condición general de todos." (T.E. pág. 16) Al preguntársele si el acusado había ingerido alcohol, contestó: "Bueno, aparentemente, pero como estábamos un poquito separados. Hablábamos duro . . . Aparentemente se había tomado unas cervezas pero yo no puedo determinar . . . en cuanto a la forma de hablar nos entendimos bien, pero como se hablaba en una forma excitada." (T.E. págs. 16–17) Después de hacérsele leer una declaración por escrito que se le había tomado durante la investigación, en cuanto a la condición del acusado en el momento de la colisión, el testigo del Pueblo contestó: "Lo noté *según la declaración* en aparente efecto de bebidas embriagantes" y que había llegado a esa conclusión porque: "Bueno, la excitación del momento, la forma de hablar . . . en una forma excitada; él y yo también" (T.E. págs. 18–19) . . . . Cuando una persona ingiere alcohol se nota en la forma de hablar (T.E. págs. 19) ; que el testigo notó esa *apariencia* en el acusado (T.E. pág. 19). Que según el testigo lo entiende "cuando uno está en estado. de embriaguez, según habla fuera de lo normal . . . gaguea" (T.E. pág. 20) ; que la forma de expresarse el acusado era como si el acusado estuviera "un poquito excitado; palabras obscenas no oí que pronunciara . . . Yo no puedo decir que estuviera borracho . . . No tengo palabras para explicarle la condición de un borracho en esas condiciones, y hablamos y discutimos lo que me trajo a creer

que él había tomado algo. Yo no puedo determinarlo" (T.E. pág. 21).

Cuando el policía estatal Sr. José A. Rodríguez Santiago llega al sitio del accidente, declara: "Cuando le pedí las generales al señor Galleti, noté en seguida que había ingerido bebidas alcohólicas por el olor y la forma incoherentemente de hablar. Estaba impertinente. (T.E. pág. 3); describiendo por primera vez, la condición del acusado contestó: "Bueno, estaba allí . . . apenas si podía dar las generales, hablaba incoherentemente y tenía olor a licor" (T.E. pág. 4). El policía Rodríguez al ser interrogado por el abogado del acusado, contestó que el acusado "estaba molesto porque él decía que el otro había tenido la culpa" (T.E. pág. 6) "estaba excitado" (T.E. pág. 9) que el acusado "no hablaba coherentemente. Además estaba impertinente y el olor a ron" (T.E. pág. 10). El policía Rodríguez dice que el acusado estaba impertinente porque "yo le pedí las generales y no me hacía caso; seguía discutiendo con el otro" (T.E. pág. 10); que esta impertinencia y el olor que expedía "fue lo que le noté" (T.E. pág. 11).

Cuando una hora más tarde, el acusado es conducido al Hospital Municipal de Yauco, ante el Dr. Luis Manuel Velasco, el Fiscal objeta y la Sala sentenciadora, lo sostiene, que el testigo médico declarara sobre los síntomas de embriaguez del acusado, pero más tarde declarando como testigo de la defensa, el Dr. Velasco declara haber hablado con el acusado en el Hospital Municipal y que el acusado "hablaba bien, hablaba normal" no se tambaleaba y estaba un poco excitado, no mucho y que lo había observado como unos diez o quince minutos (T.E. pág. 45). Cuando el testigo médico iba a declarar si, de acuerdo con su apreciación, el acusado estaba borracho o no lo estaba, el Fiscal se opuso y la ilustrada Sala sentenciadora lo sostuvo. Entonces el Fiscal no lo contrainterroga.

El peritaje químico establece que en la primera muestra de orina, el resultado fue 0.15 gramos de alcohol en 100 gra-

mos de sangre; el segundo fue de 0.13. Sobre el criterio científico empleado para determinar la embriaguez, el químico Sr. Pedro A. Sierra Purcell, declaró: "Depende de la tolerancia, del estado físico de la persona, del estado emocional de la persona, de su musculatura. De todo eso depende. Podría no estarlo y podría estarlo. Ahora, nosotros tenemos un punto establecido por nosotros basado en la teoría que hemos expuesto, que una persona con 0.15 por ciento está en estado de embriaguez independientemente de todo lo que hayamos hablado sobre la contextura física. Es lo que establece la regla; establecido un punto que con 0.15 una persona está en estado de embriaguez. De ahí para abajo está la zona oscura que puede la persona estar o no en estado de embriaguez. Eso depende de las personas que lo vieron, los médicos que lo vieron y la Policía y otras personas más que pueden decir que estaba en estado de embriaguez aún con ese 0.13." (T.E. págs. 38–39.)

Por el resumen de la prueba que hemos hecho es claro que de los tres síntomas de la embriaguez en que descansa la prueba de acusación—incoherencia en el hablar, conducta antisocial, olor a ron—la incoherencia en el hablar está mejor relacionada con la disputa sobre la negligencia que con el estado peligroso de embriaguez de acuerdo con la regla jurídica. Tan pronto el acusado sale del círculo mágico de la disputa, el acusado, según el testimonio no contradicho del Dr. Velasco, habla bien, habla normalmente y aunque parecía un poco excitado, no lo estaba fuera de lo razonable. La alteración de la conducta social que produce el súbito impacto emocional de una colisión de automóviles no es contraria a la experiencia humana y no debe dar base a ninguna extrema inferencia culposa. En cuanto al olor a ron, la descripción no es lo suficiente dramática como para inferir de ella un estado de embriaguez aparente, con su correspondiente sugestión de peligrosidad.

■ La reducción en el porciento del alcohol lo explica el perito como una posible evaporación del contenido cuando los envases no están bien sellados. Pero él mismo declara, que al hacer la segunda prueba, encontró la muestra bien tapada (T.E. pág. 34). Además se trataba de un diabético, y de acuerdo con el propio perito, hay que restarle 0.02 al resultado obtenido (T.E. pág. 42), en cuyo caso, el resultado de la primera muestra también tendría que ser rectificado de acuerdo con la prueba recibida. Es indudable que en el juego complejo de la hipótesis científica—la ciencia se considera hoy probabilidad comprobada, contrario al criterio anterior, que la consideraba verdad establecida—se puede establecer una serie de conclusiones inculpatorias o exculpatorias. Pero ante nuestra obligación de considerar culpable a una persona, fuera de toda duda razonable, la inculpación tiene que satisfacer además un sentido de justicia.

*Debe revocarse la sentencia apelada.*