FÉLIX C. HERNÁNDEZ MONTERO, demandante y apelante, *v.* ANTONIO CUEVAS VIRET, DIRECTOR, ETC., y ASOCIACIÓN DE EMPLEADOS DEL GOBIERNO DE PUERTO RICO, demandados y apelados.

*Número:* 12732      *Resuelto:* 27 de junio de 1963

*Stanley L. Feldstein,* abogado del apelante; *E. Ramos Antonini,* abogado de la Asociación de Empleados del Gobierno de Puerto Rico; *J. B. Fernández Badillo, Procurador General,* y *Nilita Vientós Gastón, Procurador General Auxiliar,* abogados de Antonio Cuevas Viret.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ MATOS emitió la opinión del Tribunal.

Se debate ante nos la constitucionalidad del procedimiento para la determinación de la incapacidad o inutilidad física del empleado público miembro de la institución pública "Asociación de Empleados del Gobierno de Puerto Rico", dispuesto por la Sec. 20 de la Ley Núm. 52 de 1921, según regía a la fecha en que surgió la inutilidad envuelta en el recurso.

Expongamos los hechos de autos que dieron lugar a la sentencia apelada: El 9 de agosto de 1955, el Jefe Interino de la Policía Estatal solicitó el retiro por incapacidad no ocupacional del policía apelante Félix C. Hernández Montero. Éste presentó dos días después ante la Oficina de Personal una solicitud de pensión por incapacidad no ocupacional. El 7 de septiembre del mismo año fue examinado por el médico del Sistema, Dr. Agustín M. Andino, quien recomendó se le concediera pensión por incapacidad no ocupacional y aconsejó se le sometiera a nuevo reconocimiento médico dentro de un año a fin de determinar si la incapacidad era permanente. (¹) El 2 de octubre de 1955 le fue concedida la pensión que dispone

---

(¹) El diagnóstico y recomendaciones del Dr. Andino, fueron así:
"Diagnóstico:
1. Artritis degenerativa múltiple, crónica, severa, afectando mayormente las articulaciones de las rodillas, el codo izquierdo y el hombro izquierdo.
2. Varicocele de tamaño moderado, testículo izquierdo, operado.
3. Pterigiones internos bilaterales.
"Recomendaciones:
Se recomienda se le conceda pensión por incapacidad no ocupa-

la Ley Núm. 447 de 15 de mayo de 1951, que fue aumentada el 1 de julio de 1957 por disposición de la Ley Núm. 80 del 20 de junio de 1957.

Una vez retirado de la Policía Estatal, se dirigió a la Asociación de Empleados del Gobierno de Puerto Rico, de la cual era miembro, en solicitud de los beneficios del seguro por inutilidad física que por ministerio de ley provee dicha asociación. El 26 de marzo de 1956 la Asociación de Empleados del Gobierno de Puerto Rico denegó la solicitud porque del examen médico a que se sometiera el apelante se desprendía que éste no estaba realmente incapacitado para el desempeño de su cargo.

El 18 de diciembre de 1957 solicitó del Superintendente de la Policía reingreso en el servicio. La solicitud fue referida a la Junta de Personal el 17 de febrero de 1958. El 10 de marzo de 1958 fue examinado nuevamente por el médico del Sistema, Dr. Rafael Coca Mir, quien dictaminó que la incapacidad de que padecía el apelante era de carácter permanente, decisión que le fue comunicada el 12 de marzo de 1958. [2] En vista de este dictamen médico se denegó su reingreso a la Policía; se le continuó la pensión por incapacidad no ocupacional y se de-

cional. El solicitante deberá someterse a reconocimiento médico dentro de un período de un año para determinar la permanencia de su incapacidad."

[2] El diagnóstico y recomendaciones del Dr. Rafael Coca Mir, fueron así:

"Diagnóstico:
1. Hipertensión arterial de tipo psicogénico.
2. Obesidad exógena simple.
3. Artritis degenerativa múltiple, al presente en estado de remisión parcial.
4. Varicocele izquierdo, de tamaño moderado, recurrente.
5. Pterigiones internos bilaterales asintomáticos.

"Recomendaciones:
Se recomienda se le continúe la pensión por incapacidad no ocupacional. Se deniega el reingreso al servicio de la Policía Estatal por entenderse que el solicitante no llena los requisitos físicos para pertenecer a dicho cuerpo. Este pensionado no deberá ser sometido a reconocimientos médicos periódicos por entenderse que su incapacidad es de carácter permanente."

claró que siendo de carácter permanente dicha incapacidad, no tenía que someterse a exámenes médicos periódicos. No apeló a la Junta de Síndicos de esta decisión del Director de la Oficina de Personal quien es el Administrador del Sistema de Retiro.

El 1 de diciembre de 1958 presentó ante el Tribunal Superior de Puerto Rico, Sala de San Juan, una demanda sobre *mandamus* y cobro de dinero, por la cual solicitaba del tribunal que ordenara al demandado Antonio Cuevas Viret, Director de la Oficina de Personal a reponerlo en su cargo de policía; o, en la alternativa, que dictara sentencia contra la codemandada Asociación de Empleados por el importe del seguro alegadamente adeudádole desde la fecha de su retiro hasta la fecha de la sentencia y que, además, ordenara a dicha demandada a continuar los pagos periódicos de dicho seguro en el futuro.

La codemandada Asociación de Empleados del Gobierno de Puerto Rico solicitó se desestimara la demanda porque ésta dejaba de exponer una reclamación que justificara la concesión de un remedio al no alegar (a) que el demandante estaba imposibilitado total y permanentemente para el desempeño de su cargo, y (b) al no alegar "que de la propia prueba médica de los médicos de la Asociación demandada resultara que estaba incapacitado total y permanentemente para el desempeño de su cargo y que no obstante la prueba médica sometida a la Junta de Directores de la demandada por sus médicos, la Junta le había denegado al demandante su solicitud del pago de la póliza de seguro que el demandante tenía con la demandada compareciente."

El codemandado Antonio Cuevas Viret, Director de la Oficina de Personal, también solicitó la desestimación, porque, según certificación que sometía del señor Rafael Serra, Jefe de la División de Retiro de la Oficina de Personal, dicha oficina concedió una pensión por incapacidad no ocupacional al allí demandante el 2 de octubre de 1955; y porque habiéndose

denegado su solicitud de reingreso al servicio de la Policía, por entender que estaba incapacitado permanentemente y habiéndosele notificado el día 12 de marzo de 1958 de la decisión dictada al efecto, él no había radicado apelación alguna y, por lo tanto, no tenía reclamación contra la oficina de Personal.

Las anteriores mociones de desestimación fueron declaradas con lugar y, en su consecuencia, se desestimó el recurso totalmente.

El tribunal de instancia fundamentó su resolución sobre la moción de desestimación de Cuevas Viret, en las siguientes circunstancias: (1) la Junta de Personal rindió una decisión favorable al apelante, de acuerdo con lo solicitado por él; (2) éste la aceptó como final al no solicitar ni su reconsideración ni su apelación oportunas; (3) el segundo examen médico que se le hizo por los doctores del Sistema ratificaron la declaración de incapacidad, y (4) el carácter final de la decisión impedía su revisión mediante el procedimiento de *mandamus*.

La desestimación respecto a la Asociación de Empleados descansó en el resultado adverso al apelante del informe de sus médicos considerado a la luz de lo dispuesto por la Sec. 20 de la Ley Núm. 52 de 1921, según enmendada, y en la doctrina sentada en el caso de *Arzola* v. *Asoc. Fondo de Ahorro*, 72 D.P.R. 421 (Snyder) (1951).

La decisión apelada claramente revela que el distinguido juez sentenciador, por el debido acatamiento a la letra de la ley y a nuestras opiniones, y nada más que por eso, se sintió obligado a desestimar y desestimó una reclamación que en su fuero interno consideraba justa, fundada y meritoria. En parte de su decisión, se expresó así:

"En este caso el peticionario ha sido claramente víctima de una gran injusticia que resulta de la interpretación de dos estatutos que cubren aspectos similares en relación con los derechos de un empleado público. Por un lado la Junta de Personal le dice que está permanentemente incapacitado para desempeñar un

cargo en el Estado Libre Asociado de Puerto Rico y por otro lado la Asociación de Empleados del Gobierno de Puerto Rico le dice que no puede cobrar un seguro porque no existen signos ni síntomas que incapaciten total y permanentemente al demandante para el cargo que desempeñaba en el Gobierno de Puerto Rico.

"Vistas las disposiciones de la sección 20 de la Ley—3 L.P.R.A. 851—y la decisión del Tribunal Supremo de Puerto Rico en el caso de *Arzola* v. *Asociación,* supra, nada podemos hacer para evitar este resultado. Corresponde a la Legislatura de Puerto Rico adoptar las medidas correspondientes para casos similares como el que está ante nuestra consideración. En tanto en cuanto no se modifique o revoque la decisión del caso de *Arzola,* dicho caso es la ley en relación con la aplicación de la sección 851 antes mencionada."

Según los expone en su alegato, los puntos en apelación suscitados por el policía apelante son los siguientes:

*"Puntos discutidos:*

I. El caso de Arzola debe ser reconsiderado y revocado.

II. Se ha violado el debido proceso de ley.

III. Se ha delegado el poder legislativo en forma anticonstitucional.

IV. Se ha invadido el poder judicial en forma anticonstitucional.

V. La demanda no carece de alegaciones necesarias.

VI. El demandante no dejó de agotar los recursos administrativos."

I

Consideremos conjuntamente los puntos marcados, I, II, III y IV, como fundamentos de la tesis de inconstitucionalidad de la Sec. 20 de la Ley Núm. 52 de 1921, según regía a la fecha en que surgió la incapacidad del apelante, (3) es decir,

---

(3) Es un poco difícil señalar, por lo que aparece en autos, la fecha, aun aproximada, en que la incapacidad del apelante adquirió el carácter, condición o estado de "total y permanente para el desempeño de su cargo o empleo en el Gobierno." Atendiendo a las fechas de los exámenes que le hicieron los doctores Andino y Coca Mir, tuvo que adquirirlo entre el 7 de setiembre de 1955 y el 10 de marzo de 1958. Entre ambas fechas la Sec. 20 permaneció inalterada.

tal como quedó enmendada—por octava vez—por la Ley Núm. 133 de 23 de abril de 1952. Su última enmienda—Ley Núm. 101 de 25 de junio de 1962—no afecta el problema aquí envuelto.

La Ley Núm. 52 aprobada el 11 de julio de 1921 creó una institución pública, de carácter compulsorio—según fue enmendada por la Ley Núm. 150 de 1937—para todos los empleados y funcionarios públicos permanentes pertenecientes al gobierno insular de Puerto Rico, denominada "Asociación de Empleados del Gobierno de Puerto Rico"—según quedó enmendada por la Ley Núm. 18 de 1954. Sus fines son: estimular el ahorro entre sus asociados y asegurarlos contra inutilidad física ó muerte, efectuar préstamos, proveerlos de hogares y clínica para el tratamiento médico de ellos y sus familiares, etc. Para tales fines u objetos, por la Sec. 1 de dicha ley—3 L.P.R.A. sec. 831—se confirieron a su organismo director las "facultades y poderes necesarios . . . para reglamentar y tomar los acuerdos y adoptar las resoluciones indispensables para ello. . . ."

Por su Sec. 20, a partir de la fecha en que empezó a regir la Ley Núm. 15 de 21 de abril de 1927, que la enmendó por segunda vez, se creó a beneficio de los miembros de esa Asociación un seguro por muerte y por inutilidad física. Ésta la constituiría "la imposibilidad total y permanente para el desempeño de su cargo o empleo en el Gobierno,[4] y por virtud de accidente o enfermedad crónica o incurable, no contraída por una vida disipada y licenciosa." En lo pertinente, el texto aplicable de esa Sec. 20—3 L.P.R.A. sec. 851— es como sigue:

"Sec. 851. Seguro por muerte e inutilidad física; derramas; beneficios.

"Por la presente se crea a beneficio de los miembros de esta Asociación el seguro por muerte y por inutilidad física. La pri-

---

[4] La enmienda hecha a esta Sec. 20 por la Ley Núm. 101 de 25 de junio de 1962, se refiere a la imposibilidad total y permanente para el desempeño de "cualquier cargo o empleo en el gobierno."

mera se acreditará por medio de certificado de defunción del registro civil donde haya sido inscrita la misma. La segunda, o sea la inutilidad, la constituye la imposibilidad total y permanente para el desempeño de su cargo o empleo en el Gobierno, y por virtud de accidente o enfermedad crónica o incurable, no contraída por una vida disipada o licenciosa, y deberá ser solicitada por escrito antes de cesar en su cargo o empleo y nunca después de transcurridos quince días, a contar de la fecha de dicho cese del funcionario o empleado afectado, de la Junta de Directores que dispondrá que se practiquen exámenes médicos sobre el estado físico del peticionario y en caso de que apareciere que el peticionario está realmente inutilizado, tendrá derecho al seguro correspondiente en la forma siguiente: el seguro se dividirá en dos categorías que se denominarán primera y segunda clase; pertenecen a la primera categoría los que expresen su voluntad de satisfacer una cuota mensual de un (1) dólar por cada defunción o inutilidad y a la segunda, los que paguen una cuota de cincuenta (50) centavos por dichos conceptos; *Disponiéndose,* que todo miembro de la Asociación que estuviere asegurado o acogido a los beneficios de cualquier otra sociedad, asociación o institución pública, cuasi-pública o privada y a quien le fuese concedida pensión, seguro o cualquier otro beneficio por inutilidad física o accidente, que le incapacite parcial o total, temporal o permanentemente, para el ejercicio de su cargo, profesión o empleo, en modo alguno afectará o prejuzgará tal decisión o declaración de beneficio la solicitud que dicho empleado pueda formular a esta asociación por la referida inutilidad o accidente, y cuya solicitud deberá regirse estrictamente por las leyes de la misma y sujeta a la resolución que en el caso se dicte por la Junta de Directores, en cuanto a su inutilidad total y permanente, *no debiéndose admitir por la Junta o los tribunales en su caso, ninguna otra prueba que la específicamente provista por las secs. 831 a 859 de este título.*" (Énfasis nuestro.)

La Sec. 25 de la Ley Núm. 52, según fue enmendada por la Ley Núm. 54 de 10 de junio de 1954, en lo pertinente dispone:

". . . todo socio que goce de los beneficios de esta ley . . . que solicitare su seguro por incapacidad total y permanente para trabajar, será sometido a un examen médico, siguiendo el mismo procedimiento a que se someten los empleados que soliciten in-

greso, y debiendo la solicitud ser aprobada por la´ Junta de Directores."

El procedimiento "a que se someten los empleados que solicitan ingreso", consiste, según esa misma Sec. 25, en la presentación de una solicitud dirigida al Presidente de la Junta de Directores, acompañada de una fotografía y de certificación de su nacimiento o partida bautismal, o en su defecto, de cualquier otro documento adecuado en ley para probar su edad. Después, conforme a su texto:

"El Presidente endosará al médico de la Asociación, la solicitud y demás documentos mencionados en el párrafo precedente, para que proceda a practicar el examen o exámenes que creyere conveniente hacer al candidato, llenando al efecto, la forma en blanco de certificación médica que le facilitará la Asociación y dando cuenta a la Junta, a la brevedad posible, del resultado de su trabajo. La Junta de Directores, al recibir dicho informe, resolverá la petición en la sesión inmediata y comunicará su resolución al solicitante y al´ departamento u oficina en que trabaja, disponiendo que se hagan los descuentos correspondientes para el fondo de ahorro y para el seguro, de conformidad con la petición del solicitante, si ésta fuere resuelta favorablemente. Si la solicitud de ingreso fuere denegada, bastará entonces que se le comunique así al interesado, dejándolo acogido únicamente al beneficio de ahorro y préstamo. . . ."

La enmienda de 1954 a esa Sec. 25, convirtió en voluntario el seguro por muerte o inutilidad para todo empleado de nuevo nombramiento.

En el citado caso de *Arzola v. Asoc. Fondo de Ahorro*, se trata de un policía que era miembro de la Asociación, y a quien se le descontaba de su sueldo la correspondiente cuota para el seguro. En diciembre de 1942, mientras desempeñaba sus deberes como policía, recibió una herida de bala. El médico de la Policía Insular determinó que estaba físicamente incapacitado para continuar desempeñando sus deberes como policía, por lo que fue separado de su cargo. En junio de 1943 solicitó de la Asociación el pago de su póli-

za por incapacidad física, a tenor con la Sec. 20 de la Ley Núm. 52. Examinado Arzola por el médico de la Asociación, éste llegó a la conclusión de que su padecimiento era de carácter provisional y desaparecería bajo ciertas condiciones. En vista de ese informe médico adverso la Asociación denegó su solicitud. Demandó a la Asociación para el cobro del seguro por incapacidad. En el juicio rehusó la corte considerar los testimonios prestados por otros médicos sobre la naturaleza de la incapacidad del demandante. Dictó fallo adverso a éste, basado únicamente en la certificación negativa del médico de la Asociación, declarando que estaba obligada por dicho informe médico adverso a resolver el caso así en vista de las disposiciones de la Sec. 20 al efecto de que (a) cuando se hace una solicitud de pago por incapacidad física, el médico de la Asociación examinará al interesado y certificará en cuanto a su condición física y (b) en cuanto a la cuestión de incapacidad total y permanente que no se admitiría por la junta o por los tribunales en su caso, ninguna otra prueba que la específicamente provista por la Ley Núm. 52.

El apelante Arzola no planteó en términos directos y precisos, como se hace en el caso de autos, la inconstitucionalidad de la Sec. 20 de la Ley Núm. 52 ó de alguna otra disposición de ese estatuto. Los señalamientos discutidos indicaban como errores el haber decidido la corte inferior (1) que no estaba facultada por ley para admitir y considerar la prueba presentada por el demandante para probar su inutilidad física y (2) que los descuentos para el seguro constituían fondos públicos de los cuales la Legislatura podía disponer a su antojo.

En los siguientes términos resolvimos finalmente ese caso:

"Es innecesario resolver si en el caso adecuado seguiríamos los casos que tratan de contratos privados de seguro. El presente no es un caso que envuelve una cláusula de un contrato entre partes privadas con respecto a la cual nuestras leyes nada dicen. Bajo dichas circunstancias quizás estaríamos en libertad de

determinar que la política pública se infringe con una cláusula en un contrato como la que se encuentra en la sección 20. Pero aquí tenemos una expresión específica de la propia Legislatura en la sección 20, sobre la política pública que gobierna este asunto. Y aun cuando los descuentos puedan ser voluntarios y los empleados públicos puedan tener ciertos derechos adquiridos en los mismos, estos fondos están bajo la custodia de 'una institución pública'. Sección 1 de la Ley núm. 52, según ha sido enmendada. El demandante voluntariamente se acogió al sistema de seguro por incapacidad física de la Asociación cuando el lenguaje en controversia ya se hallaba en la sección 20. Bajo estas circunstancias, no podemos ver sobre qué base podemos dejar sin efecto la política pública establecida por la Legislatura en la sección 20 como condición precedente al desembolso de estos fondos y establecer en su lugar por fíat judicial una política pública contraria.

"Convenimos con la corte inferior en que estaba obligada a decidir el caso de acuerdo con los requisitos de la sección 20. Bajo la misma el informe del médico de la Asociación es la única evidencia que puede considerarse sobre la cuestión de incapacidad física. Toda vez que este informe fue adverso al demandante, la corte inferior no cometió error al dictar sentencia a favor de la Asociación."

Examinemos brevemente antes de discutir el caso de *Arzola*, la Ley Núm. 52 de 1921 y otras relacionadas con ella, en lo que se refieren a la concesión o reconocimiento de derechos o beneficios a favor del empleado protegido por ellas. Ya hemos visto que la institución pública denominada Asociación de Empleados del Gobierno de Puerto Rico fue creada originalmente por la Ley Núm. 52 de 1921, para la protección y beneficio exclusivo de sus asociados, estimular el ahorro entre ellos, asegurarlos contra inutilidad física o muerte, efectuar préstamos, proveerlos de hogares y clínica para el tratamiento médico de ellos y sus familiares, y propendiendo "por todos los medios y recursos a su alcance al mejoramiento y progreso individual y colectivo de los elementos que la integran en el orden económico, moral y físicamente."

Para realizar esas finalidades la Sec. 1 de esa ley declaró

que se conferían las facultades y poderes necesarios a su organismo director para reglamentar y tomar los acuerdos y adoptar las resoluciones indispensables. Se confirió a ese organismo, por la Sec. 19 de esa ley, en términos generales, facultades para "dictar las reglas y reglamentos que fueren necesarios para la aplicación de esta ley." ([5])

---

([5]) Transcurrieron 41 años sin que se aprobara reglamento alguno para la Asociación. Fue la Junta de Directores de 1961 y 1962 la que por primera vez aprueba un reglamento el 8 de enero de 1963.

A juzgar por la experiencia en las actividades de esa Asociación, sus operaciones financieras han alcanzado un desarrollo enorme. Al 30 de junio de 1962 su capital alcanzó a $35,700,000. De esa cantidad $28,842,000 eran ahorros acumulados y $6,858,000 dividendos acumulados. Pero su sistema de seguro por muerte y por inutilidad física, posiblemente el motivo cardinal para su creación, no ha logrado a plenitud sus propósitos y objetivos. En el informe anual, fechado el 1 de octubre de 1962, que nos ha rendido el delegado de la Rama Judicial a la Asamblea de Delegados de esa Asociación y miembro de esa Asociación, en lo pertinente, se nos informó:

"El sistema de seguro de vida y de inutilidad física que administra la Asociación continúa en situación crítica. (Sin embargo su servicio de préstamos asciende a $34,097,871.00.) Las pólizas siguen pagándose con gran retraso luego de presentadas las reclamaciones de pago. Al 30 de junio de 1961 no se habían pagado por falta de fondos 266 pólizas. Durante el transcurso del año 1961–62 se aprobaron 224 pólizas adicionales. Esto hace un total de 490 pólizas. De ese total se pagaron durante el año 1961–62 175 pólizas, de suerte que al 30 de junio de 1962 quedan pendientes de pagar 315 pólizas. Es decir, 49 pólizas más que el año pasado. Todas esas pólizas tienen un valor sobre $1,700,000. Las causas de esta situación son conocidas de todos ustedes.

"La Asociación nuevamente expuso el problema del sistema de seguro a la Asamblea Legislativa. En esta ocasión procuramos la derogación de la ley creadora de nuestra institución para que en cambio se aprobara un nuevo estatuto que facilitara su administración y que además corrigiera las fallas del sistema de seguro. Nuestra gestión no tuvo éxito. En cambio este año la Asamblea Legislativa aprobó legislación que al convertirse en ley mejoró el sistema de seguro. . . ."

La situación del asegurado es inquietante, pavorosa. Por un lado, un tipo de sistema para la resolución de su caso que le puede destruir su derecho adquirido sin oirle, en forma definitiva; por el otro lado, escasísima oportunidad para cobrar el seguro cuando se lo conceden. 315 pólizas sin pagar es el cuadro de 315 personas inútiles físicamente que no pueden cobrar su seguro.

La expresión terminante de la Asamblea Legislativa de Puerto Rico, a través de su Resolución Conjunta Núm. 39 de 1ro. de mayo de 1929—3 L.P.R.A. sec. 860—respecto a la naturaleza de esa asociación y de sus fondos, fue en el sentido de que la misma respondía a y era "un plan cooperativo, que funciona bajo los auspicios del Gobierno, por virtud de legislación . . ." y que sus fondos "son de la pertenencia exclusiva de los empleados asociados."

Como dijimos en *Buscaglia, Tes.* v. *Tribunal de Contribuciones,* 67 D.P.R. 568, 581 (Todd, Jr.) (1947), esos fondos y sus dividendos, no tienen el carácter de fondos públicos, de los cuales pueda disponer el Gobierno a su arbitrio. Reconocimos allí que el derecho a la devolución íntegra de ahorros y dividendos constituían "derechos adquiridos *(vested rights)* del empleado y no podemos presumir que la Asamblea Legislativa, si pudiera hacerlo, cambiaría la ley para privarle de dichos derechos."

En *Denis* v. *Asoc. Fondo de Ahorro,* 75 D.P.R. 847, 852 (Snyder) (1954), entre otras cosas, dijimos:

". . . Suponemos que las mismas consideraciones que rigen la delegación de facultades legislativas en el caso ordinario son aplicables a las facultades de la Junta para administrar los fondos de seguros aquí envueltos, *sobre los cuales aquéllos que han contribuido a los mismos tienen ciertos derechos adquiridos.* Cf. *Arzola* v. *Asociación Fondo de Ahorro,* 72 D.P.R. 421, 424; *Buscaglia, Tes.* v. *Tribl. de Contribuciones, Riera, Interventor,* 67 D.P.R. 568, 578; *Díaz* v. *López,* 47 D.P.R. 543; *García* v. *Soltero,* 65 D.P.R. 300."

No abrigamos duda alguna que, de ser correctos los diagnósticos y conclusiones médicas a que llegaron los doctores Andino y Coca Mir, respecto al estado físico del apelante, éste había adquirido el derecho a recibir el montante del seguro por inutilidad permanente para el desempeño de las funciones de su cargo, que, precisamente, fue el motivo de su separación del cuerpo de la Policía.

Pero la frase "no debiéndose admitir por la junta o los tribunales en su caso, ninguna otra prueba que la específicamente provista por esta Ley", que se le introdujo a la Sec. 20 por la Ley Núm. 150 de 15 de mayo de 1937, constituye un absoluto mandato, de tal naturaleza prohibitiva, que convierte tanto a la Junta de Directores de esa Asociación como a los tribunales de justicia en meros sacristanes de amén del médico de la Asociación. Este médico, nombrado y pagado por la Asociación, se encuentra con plena libertad para examinar físicamente al asociado que solicita el pago del seguro por inutilidad, sin que pueda intervenir ningún otro médico y sin que venga obligado por norma, guía o directriz administrativa o legislativa alguna en el proceso de la determinación del estado o condición de inutilidad. Su "diagnóstico-fallo", elevado por ley a la categoría de sagrado tabú en todos los análisis posibles, resuelve de una vez y para siempre, inapelablemente, la solicitud del asociado.

En otras palabras, en estos casos, la facultad legal concedida por la Ley, aparentemente a la Junta de Directores, para "tomar acuerdos y adoptar resoluciones indispensables" la ejerce omnímodamente el médico de la Asociación. Después de omitido el "diagnóstico-fallo" nada hay que dudar, discutir, ni acordar, ni resolver; la Junta no puede rechazarlo por más absurdo, equivocado, arbitrario, dudoso, erróneo, injusto o incorrecto que parezca ser o que de verdad fuere; los tribunales no pueden permitir su impugnación por otros médicos, ni mucho menos anularlo ni aun modifica cosméticamente. El tribunal ante el cual acude, en tales casos, un miembro de la Asociación, agobiado por la desgracia de una inutilidad total y permanente, de cuyo sueldo se han descontado las cuotas del seguro y quien, como dijo el juez de instancia "ha sido claramente víctima de una gran injusticia", en presencia de un diagnóstico adverso, lo único que puede decir es, lo que precisamente dijo, con la mayor pesadumbre en su sentido de justicia y en su limpia conciencia el distinguido juez de

instancia: ". . . Nada podemos hacer para evitar este resultado." Es decir, proclamar un caótico estado de impotencia judicial en estos asuntos.

Como dijimos en *Pueblo* v. *Galleti Rodríguez*, (Belaval) 88 D.P.R. 284 (1963), "la ciencia se considera hoy probabilidad comprobada, contrario al criterio anterior, que la consideraba verdad establecida." En la comprobación de una probabilidad que fuere la causa determinante de un derecho adquirido, el titular o posible titular de ese derecho debe ser oído, debe tener su día en corte y las oportunidades necesarias para aducir las pruebas que le favorezcan y debe dársele la protección y seguridades mínimas para el goce y disfrute de ese derecho. ¿Por qué ha de privársele del fundamental derecho de contrainterrogar al médico que rindió el informe que le impide recibir los beneficios del seguro?. .

■ Un procedimiento judicial, como el instado ante el Tribunal Superior por el apelante, en el cual su resultado prácticamente se halla anticipado, o cuyo resultado lo controle fatal y absolutamente un dictamen médico, será cualquier cosa menos un debido procedimiento de ley. Constituirá, por la virtualidad que se le concede, una indebida delegación del ejercicio del poder judicial en favor del médico que con su diagnóstico ha resuelto los derechos adquiridos por el asociado al disfrute de su seguro.

Ello es contrario al Art. V de nuestra Constitución que determina que "El Poder Judicial de Puerto Rico se ejercerá por un Tribunal Supremo, y por aquellos tribunales que se establezcan por ley." Contraviene, en cierto sentido, al derecho a la libre asociación—Sec. 6 de ese Art. II—al derecho a no ser privado de la propiedad sin debido proceso de ley, al menoscabo de las obligaciones, hasta cierto punto contractuales, que la propia Ley Núm. 52 reconoce al asociado acogido al seguro por incapacidad o muerte.— Sec. 7 de ese Art. II.

Hay que entender objetivamente el significado de la aludida frase de la Sec. 20, que no es una simple regla de eviden-

cia. Su función positiva ha consistido hasta ahora en eliminar virtualmente a los tribunales de justicia de toda posible intervención en casos como el presente, o, en la alternativa, permitirles intervenir al único efecto de confirmar el diagnóstico-fallo del médico de la Asociación.

Lo lamentable ante un criterio sano de justicia es que, con esas expresiones de la Sec. 20—incluyéndose aquella que le priva de toda autoridad a las determinaciones hechas por otras agencias o instituciones del Gobierno sobre el mismo hecho de la inutilidad del asociado—a los tribunales se les priva, en forma absoluta, de todo poder para hacer: (1) declaración de nulidad de la adjudicación administrativa, basada en el informe del médico de la Asociación, por una aplicación errónea de la ley; (2) declaración de nulidad de la adjudicación porque el informe médico no está sostenido por la condición física del asociado; (3) declaración de nulidad porque el resultado del examen que sirvió de única base a la adjudicación es arbitrario, falso o claramente erróneo; (4) declaración de nulidad porque el diagnóstico no se ha basado en examen físico alguno del asociado, o el examen ha sido contrario a las normas médicas corrientes y usuales, o a las únicas que el caso permitía.

En *Sacarello* v. *Junta de Retiro*, 75 D.P.R. 267, 294 y 298 (1953), en la orientadora opinión del compañero Juez Asociado señor Belaval, se dijo, entre otras cosas:

"Cuando se trata de un estatuto que guarda silencio sobre revisión judicial posterior, no debe interpretarse dicho silencio en el sentido que niega 'el poder de las cortes . . ., a conceder un remedio en el ejercicio de la jurisdicción general que . . . se les ha conferido.' *Estep* v. *United States,* 327 U.S. 114, 571, 90 L.Ed. 567, 571 (Douglas ponente, Murphy, concurrente con opinión separada, Rutledge, concurrente con opinión separada, Frankfurter, concurrente en el resultado con opinión separada, Burton y Stone disidentes con opinión de Burton) (1946), y por el contrario, debe interpretarse como que 'la responsabilidad de determinar los límites de la concesión de autoridad a las agen-

cias administrativas es una función judicial encomendada a los tribunales . . . y por aquellos estatutos que establecieron dichos tribunales y fijaron su jurisdicción' *Stark* v. *Wickard,* 321 U.S. 288, 307–309, 88 L.Ed. 733, 747 (Reed ponente, Black concurrente sin opinión, Frankfurter disidente con opinión) (1944). En cuanto a cualquier posible lesión de un derecho constitucional, el lenguaje utilizado por el juez concurrente Murphy, en *Estep* v. *United States,* supra, cita estricta a las páginas 127–129 U.S. 575–576 L.Ed. 1 (1946): 'dentro de nuestro sistema no hay ningún fundamento para sostener el punto de vista que el poder judicial de una corte con competencia puede ser circunscrito por algún diseño legislativo que pretenda darle autoridad a la adjudicación administrativa por encima de las limitaciones impuestas por la constitución', no deja lugar a dudas en cuanto a la obligación de los tribunales tradicionales, de intervenir en cualquier momento en favor de una parte, a quien se le pueda haber lesionado un derecho constitucional."

Según aparece de los escolios (1) y (2) la condición física del apelante Hernández Montero en 1955 y 1958 era seria. El Dr. Andino le diagnosticó en 1955 una artritis degenerativa múltiple, crónica, severa, afectando mayormente las articulaciones de las rodillas, el codo izquierdo y el hombro izquierdo; en 1958, según el Dr. Coca Mir, persiste la artritis degenerativa múltiple; tiene pterigiones internos bilaterales, que subsisten en 1958; tenía varicocele izquierdo, de tamaño moderado, recurrente; hipertensión arterial de tipo psicogénico en 1958 y obesidad exógena simple. El primero de esos médicos recomienda la concesión de pensión por incapacidad no ocupacional; el segundo recomienda tres años después, o sea, en 1958, (a) que se le continúe la pensión por incapacidad no ocupacional, (b) que se le deniegue el reingreso al servicio de la Policía Estatal por entenderse que el solicitante no llenó los requisitos físicos para pertenecer a dicho cuerpo y (c) que no se le someta a reconocimientos médicos periódicos por entender que su incapacidad es de carácter permanente. Frente a ese poco envidiable cuadro de salud, que la Sec. 20 prohibe que se le demuestre al juez de instancia,

se encuentra el informe médico del doctor de la Asociación, en el que aparece que dicho policía no sufre de inutilidad física para el desempeño de su cargo, pero al que la Policía Estatal no le da valor alguno cuando, a base de él, Hernández Montero solicita su reingreso al cuerpo. Como dijo el ilustrado juez de instancia:

"Por un lado la Junta de Personal le dice que está permanentemente incapacitado para desempeñar un cargo en el Estado Libre Asociado de Puerto Rico y por otro lado la Asociación de Empleados del Gobierno de Puerto Rico le dice que *no puede cobrar un seguro porque no existen signos ni síntomas que incapaciten total y permanentemente al demandante para el cargo que desempeñaba en el Gobierno de Puerto Rico.*"

Como se dijo en el citado caso de *Sacarello* ". . . este es un caso típico de la confiscación de un derecho sin el debido proceso de ley." (Pág. 290.)

■ Bajo nuestro sistema constitucional la Asamblea Legislativa no puede impedir directa o indirectamente, que los tribunales de justicia ejerzan sus facultades revisoras en casos en que se ha actuado, o puede actuarse, por las agencias administrativas en forma contraria a imperativos preceptos constitucionales.

Vamos a considerar ahora la impugnación al caso de *Arzola* v. *Asoc. Fondo de Ahorro,* cuyos hechos dejamos reseñados. En él confirmamos la sentencia del antiguo Tribunal de Distrito, Sección de San Juan, dictada el 13 de abril de 1949, que desestimó la demanda por creerse obligado por la Sec. 20, en la parte que dispone que no podrá considerarse otra evidencia fuera del informe médico del doctor de la Asociación. La demanda fue presentada en diciembre de 1944. Lo resolvimos el 19 de abril de 1951, aceptando como válida la mencionada frase de esa Sec. 20, por considerarla "una expresión específica de la propia Legislatura . . . sobre la política pública que gobierna este asunto", y porque los fondos con los cuales se pagaba el seguro estaban "bajo la

custodia de una institución pública." Nos declaramos impotentes para remediar la situación del policía Arzola allí demandante, al decir: "Bajo estas circunstancias—entre las cuales estaba la de haberse acogido Arzola voluntariamente al seguro 'cuando el lenguaje en controversia ya se hallaba en la sección 20'—no podemos ver sobre qué base podemos dejar sin efecto la política pública establecida por la Legislatura en la sección 20 como condición precedente al desembolso de estos fondos."

Evidentemente al resolver el recurso bajo la errónea premisa de que el legislador nos había atado las manos y que contra esa situación estábamos obligados a considerar justa y correcta la sentencia apelada, no consideramos, desde luego, porque no se nos planteó, que bajo las disposiciones de la Constitución federal o bien bajo las de nuestra Carta Orgánica de 1917, era inválida toda ley o parte de ley que (a) privara a una persona de su propiedad sin el debido procedimiento de ley o que le negare la igual protección de las leyes; (b) menoscabara el valor de los contratos; (c) que expropiara en beneficio de una institución pública, sin justa compensación, la propiedad o los derechos particulares; (d) que trasladara, en cualquier forma, el poder judicial que residía exclusivamente "en las cortes y tribunales de Puerto Rico", a otras personas o entidades.

■ Tampoco consideramos que el seguro que entraba en juego, a base de descuentos hechos al sueldo de cada empleado asegurado era un contrato de adhesión; que la validez o el cumplimiento de los contratos no puede dejarse al arbitrio de personas extrañas al mismo; que una parte en un contrato—la Asociación demandada—no puede convertirse en juez y parte en una controversia sobre su validez o cumplimiento. (6)

---

(6) Siendo, por lo general, el contrato de seguro una actividad negocial situada en la esfera mercantil, no sería impropio recordar los principios de buena ley encerrados en el Art. 88 de nuestro Código de Comercio, edición de 1932, que dice así:

■ La obra legislativa debe responder o ajustarse a las normas constitucionales. Si las viola abiertamente la obra legislativa de nada sirve; a nadie obliga.

■ A una disposición legislativa que tiene los alcances que hemos apuntado, no se puede válidamente caracterizar como una "condición precedente", del contrato de seguro cooperativo o mutuo, creado por la Ley Núm. 52. De aceptarse como tal, estaríamos ante un seguro cuyo pago dependería del criterio de personas ajenas al mismo. El organismo director de la Asociación, respecto al seguro, lo constituiría (como parece que en la realidad lo constituye), el médico de la Asociación. La comprobación de la inutilidad física total y permanente, es lo que debe considerarse condición precedente para el pago del seguro. Ante los tribunales de justicia esa comprobación puede y debe hacerse en el procedimiento civil ordinario dispuesto por nuestras Reglas y con sujeción a nuestra Ley de Evidencia.

El lenguaje abiertamente inconstitucional de la mencionada frase de la Sec. 20 de la Ley, volvemos a repetir, en nada obliga al asegurado. (⁷)

---

"Los contratos de comercio se ejecutarán y cumplirán de buena fe, según los términos en que fueren hechos y redactados, sin tergiversar con interpretaciones arbitrarias el sentido recto, propio y usual de las palabras dichas o escritas, ni restringir los efectos que naturalmente se deriven del modo con que los contratantes hubieren explicado su voluntad y contraído sus obligaciones."

(⁷) Los requisitos del debido procedimiento de ley son de aplicación tanto en lo judicial como en lo administrativo. *Shields* v. *Utah Idaho C. R. Co.*, 305 U.S. 117; *Yamataya* v. *Fisher*, 189 U.S. 86; *People* v. *Belcastro*, 190 N.E. 301, 92 A.L.R. 1223. El debido procedimiento de ley requiere que los procedimientos se ajusten y sean apropiados al caso en el cual son usados; que sean justos para con las partes a ser afectadas y que se adapten apropiadamente a los fines que se desea conseguir. *Hagar* v. *Reclamation Dist.*, 111 U.S. 701; *Federal Communications Comm.* v. *Station WJB*, 337 U.S. 265, citado en Davis, *Administrative Law Treatise*, Vol. 1, Sec. 7.07, pág. 435. La cláusula sobre el debido procedimiento de ley garantiza que en los procedimientos judiciales o cuasi-judiciales el juzgador de los hechos será un tribunal imparcial, legalmente constituido; que no hará determinaciones sin avisar a las partes o sin darle oportunidad a ser oídas y que los procedimientos en las vistas serán compatibles con los de un

Se dice en la opinión del caso de Arzola que los casos citados por el apelante no son de aplicación ya que:

(a) se trata de cláusulas en contratos privados entre una compañía de seguros y un asegurado sobre las cuales las leyes guardan silencio; o,

(b) se trata de disposiciones constitucionales estatales que no se encuentran en nuestra Carta Orgánica.

En los casos de:

1. *Penquite* v. *Dunn, Mayor, et al.*, 256 Pac. 130 (1927).

2. *Meyer* v. *Board of Trustees of Firemen's Pension & Relief Fund*, 6 So.2d 713, no se trata de un contrato privado entre una compañía de seguros y un asegurado. Se trata de controversias similares a la del caso de autos. En los otros casos se trata de contratos entre el asegurado y compañías privadas o uniones obreras. Todos los casos citados, excepto uno, citado cf.—*Board of Trustees, etc.* v. *McCrory*, 116 S.W. 326 (Ky. 1909), son contrarios a la opinión expresada por este Tribunal en el caso de *Arzola*. La otra cita contraria es también cf.—6 Williston, *On Contracts*, sec. 1723, pág. 4864, 68 (1938). En el suplemento del mismo tomo de la obra de Williston se cita como variando la doctrina expresada, el caso de *American Casualty Co.* v. *Horton*, 152 S.W.2d 395 (1941).

En los casos en que se trataba de una limitación en cuanto a la prueba admisible, los tribunales rechazaron las alegaciones sobre la exclusividad de esta evidencia.

En *López* v. *Junta de Planificación*, 80 D.P.R. 646, 661 (Saldaña) (1958), dijimos:

"Sin duda, la Legislatura no puede delegar poderes arbitrarios e ilimitados a los organismos administrativos. La ley debe

---

juicio justo e imparcial. Cf. *Kessler* v. *Strecker*, 307 U.S. 22; *Morgan* v. *United States*, 304 U.S. 1; *St. Joseph Stockyards Co.* v. *United States*, 298 U.S. 38; *State ex rel. Hurwitz* v. *North*, 264 S.W. 678, confirmado en 271 U.S. 40; *Alemañy* v. *Com. Industrial*, 63 D.P.R. 601 (1944); *Figueroa* v. *Com. Industrial*, 64 D.P.R. 627 (1945); *Ledesma, Admor.* v. *Tribunal de Distrito*, 73 D.P.R. 396 (1952); *Eastern Sugar Associates* v. *Junta Azucarera*, 77 D.P.R. 374 (1954).

contener *siempre* normas adecuadas que sirvan de guía y que limiten el uso del poder delegado, ya sea éste el de promulgar reglamentos con fuerza de ley (*rule making*) o el de resolver controversias específicas a la luz de hechos concretos (*adjudication*). Pero no es indispensable que la ley fije normas detalladas y minuciosas. Dadas las condiciones sociales y económicas modernas, (1) la Legislatura no puede considerar los detalles de los programas de gobierno: su función esencial es la de establecer pautas generales y si tratase de intervenir en los detalles no podría desempeñarla a cabalidad; (2) con frecuencia es preciso desarrollar programas que exigen la supervisión constante, el conocimiento técnico y la experiencia especializada de organismos administrativos; y (3) siempre resulta esencial para la realización efectiva de esos programas conceder un amplio margen de discreción a dichos organismos. Por eso, la delegación de poderes puede hacerse constitucionalmente a base de normas amplias y generales."

Al posible argumento de que en la Sec. 851 (3 L.P.R.A.) se fija un *standard* o patrón al decirse que: ". . . La segunda, o sea la inutilidad, la constituye la imposibilidad total y permanente para el desempeño de su cargo o empleo en el Gobierno, y por virtud de accidente o enfermedad crónica o incurable no contraída por una vida disipada y licenciosa . . .", habrá que responder que esto sería un hecho que tendría que adjudicarse cosa que no se ha hecho y que no se ha dado oportunidad de hacerse. Pero aun así, esta frase por sí sola no es un *standard* apropiado. Véase *Schechter Corp.* v. *United States,* 295 U.S. 495.

El argumento sometido por el Procurador General en cuanto a que este Tribunal ha sostenido repetidamente la constitucionalidad de esta sección y específicamente determinando que hay suficientes normas o política expresadas en dicha sección por lo dicho en *Denis* v. *Asoc. Fondo de Ahorro,* supra, y en *Arzola* v. *Asoc. Fondo de Ahorro,* supra, no creemos que se puede sostener.

En el caso de *Denis* v. *Asoc. Fondo de Ahorro,* supra, la cláusula de la ley que estaba en controversia era la 20 (d).

Esta cláusula fija y determina minuciosamente los patrones a seguirse. Esta cláusula 20 (d) podría tomarse como patrón de lo que se debía haber hecho y no se hizo en cuanto a la sección pertinente al seguro por incapacidad.

■ De cualquier manera debemos tener en cuenta que la Legislatura no tiene poder constitucional para aprobar un estatuto confiscatorio como tampoco lo tiene para delegar en un organismo administrativo facultad para resolver derechos en una forma que resultara confiscatoria. *Gegiow* v. *Uhl.*, 239 U.S. 3; *St. Joseph Stockyards Co.* v. *United States*, 298 U.S. 38 (52); *Estep* v. *United States*, 327 U.S. 114; *Joint Anti-Fascist Refugee Committee* v. *McGrath*, 341 U.S. 123.

■ Por lo expuesto revocamos el caso de *Arzola* v. *Asoc. Fondo de Ahorro*, 72 D.P.R. 421 (Snyder) (1951), y declaramos inválido, por inconstitucional, el "Disponiéndose" del primer párrafo de la Sec. 20 de la Ley Núm. 52 de 1921 y cuyo texto insertamos en la página 793 precedente.

## II

A la luz de lo que dejamos consignado, resolvemos que la demanda presentada el 2 de diciembre de 1958, expone hechos suficientes para que se conceda el remedio que solicita respecto a la codemandada Asociación de Empleados del Gobierno de Puerto Rico.

Por la forma alternativa de la acción ejercitada y por la disposición que haremos del caso, consideramos innecesaria la resolución del punto VI, respecto a si el apelante dejó o no dejó de agotar los recursos administrativos.

En lo que concierne al codemandado Antonio Cuevas Viret, como Director de la Oficina de Personal, realmente no existe controversia seria en este recurso. Esa Oficina reconoció la incapacidad del apelante y aceptó los diagnósticos médicos que la determinaban en distintas épocas. El propio apelante, en su alegato (pág. 18) nos dice que solicitó su reingreso "como especie de confirmación de su capacidad."

*La sentencia apelada deberá ser confirmada en cuanto la misma desestimó la demanda respecto al codemandado Antonio Cuevas Viret, Director, etc., pero deberá ser revocada dicha sentencia en cuanto por la misma se desestimó la demanda en lo referente a la codemandada Asociación de Empleados del Gobierno de Puerto Rico y deberá devolverse el caso al Tribunal Superior, Sala de San Juan, para ulteriores procedimientos compatibles con esta opinión.*